MANATT, PHELPS & PHILLIPS, LLP
Mark S. Lee (CA Bar No. 94103 – Admitted Pro Hac Vice)
Beverly R. Frank (BF 3087)
11355 West Olympic Boulevard
Los Angeles, CA  90064-1614

MANATT, PHELPS & PHILLIPS, LLP
Cynthia S. Arato (CA 8350)
7 Times Square, 22nd Floor
New York, NY 10036

Attorneys for Defendants
THOMAS STEINBECK and BLAKE SMYLE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **PENGUIN GROUP (USA) INC.,**<br><br>       **Plaintiff,**<br><br>       **-against-**<br><br>**THOMAS STEINBECK and BLAKE SMYLE,**<br><br>       **Defendants.** | CASE NO.  04 Civ. 6795 (RO)<br>ECF CASE |

## DEFENDANTS THOMAS STEINBECK'S AND BLAKE SMYLE'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

I.    INTRODUCTION.................................................................................................1

II.   UNDISPUTED FACTS .......................................................................................3

    A.    The Parties.................................................................................................3

    B.    The Penguin Agreements and the Works At Issue..................................4

    C.    Steinbeck's Notice of Termination And Penguin's Complaint...............6

III.  THOM AND BLAKE VALIDLY TERMINATED PENGUIN'S  RIGHTS IN
     THE STEINBECK WORKS AS A MATTER OF LAW ....................................6

    A.    The Copyright Act Provides Statutory Heirs With An Inalienable Right To
        Recapture Previously Transferred Copyright Interests .........................6

        1.    Protecting Heirs Under The Copyright Acts Of 1790 and 1831 ...............7

        2.    The Flawed Protection of Heirs Under The Copyright Act of 1909..........8

        3.    Again Protecting Heirs Under The Copyright Act Of 1976......................8

        4.    Protecting Heirs Under The Sonny Bono Copyright Term
            Extension Act ........................................................................................12

        5.    Thom And Blake Properly Exercised Their Section 304(d)
            Termination Rights..................................................................................13

    B.    The 1994 Agreement Does Not And Cannot Void Thom's and Blake's
        Inalienable Termination Rights .............................................................13

        1.    The 1994 Agreement Expressly Provides that Elaine Retains Her
            Section 304 Termination Rights..............................................................13

        2.    The 1994 Agreement Could Not Affect Termination Rights As A
            Matter of Copyright Law.........................................................................15

            a.    A Simultaneous "Cancellation" And "Regrant" Of
                Copyright Interests Does Not Affect Termination Rights ...........15

            b.    The 1994 Agreement Is "An Agreement To The Contrary"
                Barred By Section 304(c)(5) To The Extent It Purports To
                Affect Termination Rights ..........................................................21

IV.   CONCLUSION ...............................................................................................25

# TABLE OF AUTHORITIES

Page

## CASES

*De La Hoya v. Top Rank, Inc.*,
  2001 WL 34624886 (C.D. Cal. February 6, 2001) .................................................. 17, 18, 19

*De Sylva v. Ballantine*,
  351 U.S. 570 (1956) ........................................................................................................ 8

*Edwards v. Born, Inc.*,
  792 F.2d 387 (3d Cir. 1986) .......................................................................................... 24

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*,
  155 F.3d 17 (2d Cir. 1998) ............................................................................................ 11

*Fred Fisher Music Co. v. M. Witmark & Sons*,
  318 U.S. 643 (1943) ............................................................................................ 8, 22, 25

*Larry Spier, Inc. v. Bourne Co.*,
  953 F. 2d 774 (2d Cir. 1992) ............................................................................ 10, 11, 23, 24

*Loctite VSI, Inc. v. Chemfab N.Y. Inc.*,
  701 N.Y.S. 2d 723 (N.Y. Sup. Ct. App. Div. 2000) ........................................................ 15

*Marvel Characters, Inc. v. Simon*,
  310 F.3d 280 (2d Cir. 2002) ............................................................................ 21, 22, 24, 25

*Milne v. Slesinger*,
  2003 WL 21076983 (C.D. Cal., May 8, 2003) ............................................................ 20, 21

*Music Sales Corp. v. Morris*,
  73 F. Supp. 2d 364 (S.D.N.Y. 1999) ...................................................................... 10, 23, 24

*Muzak Corp. v. Hotel Taft Corp.*,
  1 N.Y. 2d 42 (N.Y. App. 1956) ...................................................................................... 15

*State Street Bank And Trust Co. v. Salovdara*,
  326 F.2d 130 (2d Cir. 2003) ............................................................................................ 22

*Stewart v. Abend*,
  495 U.S. 207 (1990) .......................................................................................... 7, 8, 10

*Woods v. Bourne Co.*,
  60 F.3d 978 (2d Cir. 1995) .............................................................................................. 8

## STATUTES

1 Stat. 124 ...................................................................................................................... 7

17 U.S.C. § 203 ...................................................................................................... 11, 21

17 U.S.C. § 24 (former) .................................................................................................... 8

17 U.S.C. § 304 ...................................................................................................... passim

17 U.S.C. § 304(a) .................................................................................................... 9, 12

17 U.S.C. § 304(b) ........................................................................................................ 12

## TABLE OF AUTHORITIES
### (continued)

**Page**

17 U.S.C. § 304(c)...................................................................................................passim
17 U.S.C. § 304(c)(3) ..............................................................................................9
17 U.S.C. § 304(c)(4)(A) .........................................................................................9
17 U.S.C. § 304(c)(6) ...............................................................................................24
17 U.S.C. § 304(c)(6)(B)...........................................................................................11
17 U.S.C. § 304(c)(6)(D) .........................................................................................11, 14
17 U.S.C. § 304(d) ..................................................................................................passim
17 U.S.C. § 304(d)(1)................................................................................................12, 21
17 U.S.C. § 304(d)(2)................................................................................................12
17 U.S.C. §302(d) ....................................................................................................9
4 Stat. 436................................................................................................................7

### OTHER AUTHORITIES

1A Arthur L. Corbin, *Corbin on Contracts* § 186 (1963) .............................................17
2 Arthur L. Corbin, *Corbin on Contracts* § 7.15 (Rev'd ed. 1995) ............................17
3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 9.02 (2002)...........................7, 8
3 M. Nimmer & D. Nimmer, *Nimmer on Copyright*, § 11.01 (2002)........................11
3 M. Nimmer & D. Nimmer, *Nimmer on Copyright*, § 11.07 (2002).............................16, 17, 19
H. R. REP. NO. 2222, at 14 (1909) .............................................................................8
H. R. REP. NO. 94-1476, at 140 (1976).................................................................9, 10
*Restatement (Second) of Contracts* § 89 cmt. b .........................................................17

## I.   **INTRODUCTION**

This action is an improper attempt by Plaintiff Penguin Group (USA) Inc. to deprive defendants Thomas Steinbeck and Blake Smyle of their inalienable right to terminate a grant of copyrights given to Penguin in 1938 by their father and grandfather John Steinbeck.  On June 8, 2004, Thom and Blake served Penguin with a timely and proper "notice of termination," as authorized by Section 304(d) of the United States' Copyright Act, extinguishing Penguin's right to publish certain works authored by John Steinbeck. Penguin has refused to abide by this lawful termination.  Rather, Penguin disingenuously asks this Court to declare that Thom and Blake's termination rights have been "extinguished" by a 1994 agreement that Penguin entered into with Steinbeck's widow, Elaine Steinbeck.

Penguin's position is contrary to black-letter copyright law and the express language of the 1994 agreement.  Section 304 of the Copyright Act gives authors and their statutory heirs the absolute right to terminate any grant of copyright made before 1978, so that authors and statutory heirs like Thom and Blake are not stuck with grants given long before a copyright's true value is known and can renegotiate new grants on the open market.  Indeed, Congress considered this termination right so essential to effectuate the purposes of the copyright laws that Congress made the right inalienable.  Thus, to ensure that book publishers like Penguin, and other copyright grantees, cannot "contract around" this termination right, Section 304 of the Copyright Act provides that "[t]ermination of [the prior grant] may be effectuated notwithstanding any agreement to the contrary."

Ignoring this clear law, Penguin seeks to deprive Thom and Blake of their inalienable termination rights by contending that its 1994 agreement with Elaine is a "new" grant of copyright, made after 1978, such that Section 304 termination rights do not apply.  Specifically, Penguin contends that this "new" document purportedly "cancelled and superceded" the original

1

grant of copyright given by John Steinbeck in 1938 and thus turned John Steinbeck's pre-1978 grant – to which Section 304 termination rights unquestionably apply – into a post-1978 grant to which Section 304 rights do not apply.  Penguin's contention is completely disingenuous and incorrect as a matter of law for the following three reasons.

First, the 1994 Agreement explicitly addressed the fact that the copyright interests purportedly granted by that document were subject to later termination pursuant to Section 304. The 1994 agreement thus makes crystal clear Penguin's recognition that Section 304 termination rights could be exercised after the 1994 agreement was entered into and that the rights granted to Penguin by that agreement necessarily were limited by any such subsequent termination.  This Court should thus reject Penguin's absurd after-the-fact contention that this agreement extinguished the very termination rights that this agreement expressly acknowledged both existed and could be exercised.

Second, the 1994 agreement cannot be construed as a "new" post-1978 agreement to which Section 304 does not apply.  The whole point of Section 304 is to ensure that a copyright grantor may fully revoke a grant given prior to 1978 before entering into any new agreement.  In other words, the grantor must be permitted a "moment of freedom" during which he or she is no longer obligated under the prior grant.  That emphatically did not happen here.  Rather, the 1994 agreement purportedly simultaneously "cancelled" the original 1938 grant given by John Steinbeck to Penguin and "regranted" to Penguin the same rights conveyed in that earlier document.  At no point between the cancellation of the 1938 agreement and the signing of the purportedly "new" 1994 agreement was the 1938 agreement ever extinguished.  Indeed, the 1994 agreement provides that such cancellation cannot occur unless and until the 1994 agreement was fully executed.  In these circumstances, the 1994 agreement did not genuinely "cancel" the 1938

2

agreement as a matter of federal copyright law because it never discharged that old agreement in a way that left Steinbeck's statutory heirs a "moment of freedom" from Penguin. The operative grant for purposes of Section 304 thus remains Steinbeck's original grant in 1938, a pre-1978 grant over which Section 304's termination rights indisputably apply.

Third, the 1994 agreement could not extinguish Thom's and Blake's termination rights even if it purported to do so, because, as set forth above and explained more fully below, the Copyright Act expressly provides that terminations may be effectuated notwithstanding any prior "agreement to the contrary." Under this black-letter copyright law, the 1994 agreement is null and void to the extent it purports to be such an "agreement to the contrary."

For each of these reasons, summary judgment should be granted in favor of defendants, dismissing Penguin's declaratory relief complaint in its entirety.

## II. UNDISPUTED FACTS

### A. The Parties

Defendants Thom Steinbeck and Blake Smyle are the son and granddaughter of Nobel Prize-winning author John Steinbeck ("Steinbeck"). (Undisputed Fact ¶¶ 6-7.)[1] Defendants are the sole living heirs of John Steinbeck. (Undisputed Fact ¶ 8.)

John Steinbeck died in 1968. (Undisputed Fact ¶ 3.) His widow, Elaine Steinbeck ("Elaine") inherited Steinbeck's interests in the literary works authored by him pursuant to a residuary provision of his will. (Undisputed Fact ¶ 4.) Elaine died in April 2003 and willed her interests in the Steinbeck Works to a child from a previous marriage and others who are not related to Steinbeck. (Undisputed Fact ¶ 5.)

---

[1]    "Undisputed Fact ¶ ___" refers to Thom's and Blake's Local Rule 56.1 Statement of Undisputed Material Facts submitted herewith.

Plaintiff Penguin (or its predecessor) is a literary publisher which since 1938 has published various works authored by John Steinbeck. (Undisputed Fact ¶ 2.)

**B.    The Penguin Agreements and the Works At Issue**

Penguin and John Steinbeck entered into an agreement in 1938, as amended (the "1938 Agreement"), pursuant to which Penguin obtained the rights to exploit certain of Steinbeck's works, including the ten at issue here. (Undisputed Fact ¶ 2.) Those works are *Cup of Gold, The Pastures of Heaven, The Red Party, To A God Unknown, Tortilla Flat, In Dubious Battle, Of Mice and Men, Of Mice and Men (Play), The Long Valley,* and *The Grapes of Wrath.* (Undisputed Fact ¶ 1.)

In 1994, fifty-six years after entering into the 1938 Agreement, Penguin entered into an agreement with Elaine (the "1994 Agreement"). That agreement provides for the "continued publication" of the Steinbeck Works and purports to grant to Penguin the same rights Penguin already was exercising under the original 1938 Agreement. (Undisputed Fact ¶ 9.) While the 1994 Agreement states that it "will cancel and supersede the previous agreements" that Penguin had entered into with Steinbeck, it could not do so unless and until the 1994 Agreement was signed by Elaine and Penguin. (*Id.*) Thus, at no point did Penguin lose control of the rights originally granted to it under the 1938 Agreement. (*Id.*)

The 1994 Agreement does not purport to transfer Elaine's or anyone else's "termination" rights under Section 304 of the United States Copyright Act. (*Id.*) Nor does it require Elaine or anyone else to refrain from exercising such rights. (*Id.*) To the contrary, paragraph 9A of the 1994 Agreement expressly acknowledges that such termination rights – which had not yet been exercised – *could* be exercised in the future. (Undisputed Fact ¶ 10.) Accordingly, paragraph 9A contains detailed provisions about what would happen if (i) such termination rights were

4

exercised; and (ii) the copyright interests in the Steinbeck Works were not subsequently regranted to Penguin. (*Id.*) Specifically, paragraph 9A provides that:

> 9A.    If Elaine Steinbeck exercises the right to terminate grants made to Publisher in this agreement (in accordance with Section 304(c) of Title 17 of the U.S. Code) and if the Terminating party(ies) fail(s) to enter into an agreement with Publisher for Publisher to continue to publish the terminated work(s), then Publisher may take the following actions:
>
> 1.    The amount by which the Guaranteed Advance Payments exceed royalties due and/or paid to all Authors from the date of this contract until the date a Notice of Termination is received by Publisher ("Excess Guaranteed Payments") shall be calculated on a work-by-work basis (pro-rated in proportion to the royalties generated by each work during the period). The amount of the Excess Guaranteed Payment attributable to the terminated work (even if received by other than the terminating party) shall be, at Publisher's option, recoverable by Publisher from any royalties and/or further Guaranteed Advance Payments owed to the terminating party or parties (as pro-rated) from that date forward, on account of the terminating party(ies)'s interest in the terminated work (if any) during the period between notice of termination and recapture and/or on account of the terminating party(ies)'s pro-rata interest in any non-terminated works that are the subject of this agreement.
>
> 2.    In addition to the right to recapture the excess over earnings on Guaranteed Advances as provided above, in the event the terminating party(ies) wish to transfer the recaptured rights to a third party, they shall first offer them to Publisher in the following manner:
>
> (i)    If terminating party(ies) decide(s) to accept a bona fide offer with respect to all or part of the terminated work(s) then in each such instance terminating party(ies) shall, promptly after deciding to accept such offer, give Publisher written notice specifying such terms and conditions which terminating party(ies) is(are) prepared to accept and the name(s) of the third party who made the offer to terminating party(ies). At any time within fifteen (15) days after receipt of such written notice from terminating party(ies), Publisher may notify terminating party(ies) in writing of its acceptance of such offer and, in such event, the rights referred to in such offer shall be assigned to Publisher, subject to Publisher's compliance with the terms of the offer so accepted. If Publisher shall acquire from terminating party(ies) all or part of the

> terminated work(s), then both parties agree to enter into a written agreement with respect thereto.
>
> (ii)    If Publisher shall elect not to purchase the terminated work(s), the terminating party(ies) may dispose of said terminated work(s) but only to the offerer and upon the terms and conditions specified in such notice, it being understood and agreed that terminating party(ies) may not dispose of such rights to any other party or upon terms and conditions any different from those offered to Publisher hereunder without again offering such terminated work(s) to Publisher as herein provided.

(*See* Complaint Exhibit A.)

Neither Thom nor Blake were parties to the 1994 Agreement, and they have never contractually transferred their termination rights to Penguin nor agreed to forego their termination rights.  (Undisputed Fact ¶¶ 11-13.)

### C.    Steinbeck's Notice of Termination And Penguin's Complaint

In June 2004, and pursuant to 17 U.S.C. § 304(d), Thom and Blake served a notice of termination upon Penguin for the Steinbeck Works.  (Undisputed Fact ¶ 14.)

Penguin filed this action on or about July 15, 2004, seeking a declaration that Thom and Blake's termination notice was invalid.  Penguin asserts that its 1994 Agreement with Elaine contractually eliminated the inalienable termination rights granted to Thom and Blake by the Copyright Act.  As we now demonstrate, this is incorrect as a matter of law.

## III.    THOM AND BLAKE VALIDLY TERMINATED PENGUIN'S RIGHTS IN THE STEINBECK WORKS AS A MATTER OF LAW

### A.    The Copyright Act Provides Statutory Heirs With An Inalienable Right To Recapture Previously Transferred Copyright Interests

Since it was first enacted over 200 years ago, the United States' Copyright Act always has provided for authors or their families to "recapture" copyright interests that they have previously transferred.  Congress has repeatedly strengthened and enhanced these "recapture" rights and has made such rights completely inalienable, recognizing that they are essential to

6

protect authors and their heirs and to allow these individuals to realize the full value of a copyrighted work. *Stewart v. Abend*, 495 U.S. 207, 219 (1990), quoting 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 9.02, p. 9-8 (2002) (hereafter "*Nimmer on Copyright*"). Significantly for this dispute, Congress has, most recently, created "termination" rights to benefit a set class of statutory copyright heirs. 17 U.S.C. §§ 304(c), (d). As demonstrated below, to provide maximum protection to these statutory heirs, Congress provided that authors cannot give away their heir's termination rights, and that third parties cannot contract around them. *Id.*

### 1.   Protecting Heirs Under The Copyright Acts Of 1790 and 1831

The very first federal copyright statute, the Copyright Act of 1790, provided for two separate copyright terms of 14 years each. Under that act, after an initial copyright term of 14 years had passed in a copyrighted work, authors or their families had the right to "renew" a copyrighted work for a second 14-year period. *See* 1 Stat. 124; *Stewart v. Abend, supra,* 495 U.S. 217. This renewal period allowed authors and their families to "recapture" during the renewal term copyrights transferred away during the initial term. *Id.*

The Copyright Act of 1831 (the "1831 Act") expanded this renewal/recapture right. It again recognized the right of authors and their families to retrieve during the renewal term copyrights that had previously been assigned away. *See* 4 Stat. 436. And it again did so to permit "the author, originally in a poor bargaining position, to renegotiate the terms of the grant once the value of the work has been tested." *Stewart v. Abend, supra*, 495 U.S. at 217.

However, unlike the original Act, the 1831 Act divested authors of the right to assign away their spouse's or children's renewal rights. *See* 4 Stat. 436; *Stewart v. Abend, supra*, 495 U.S. at 217. By these provisions, "Congress also intended to secure to the author's family the opportunity to exploit the work if the author died before he could register for the renewal term." *Stewart v. Abend, supra*, 495 U.S. at 218. "The evident purpose of [the renewal provision] is to

provide for the family of the author after his death. Since the author cannot assign his family's renewal rights, [it] takes the form of a compulsory bequest of the copyright to the designated persons." *Stewart v. Abend, supra*, at 217, quoting *De Sylva v. Ballantine*, 351 U.S. 570, 582 (1956). "It is, then, clear that the renewal provision was intended to benefit authors by enabling them or their families to have a second opportunity to market their works after an original sale of the copyright." *Nimmer on Copyright* § 9.02.

### 2.     The Flawed Protection of Heirs Under The Copyright Act of 1909

The Copyright Act of 1909 (the "1909 Act") expanded both the initial and renewal term from 14 to 28 years. *See* former 17 U.S.C. § 24; H.R. Rep. No. 2222, 60th Congress, 2d Sess., 14 (1909).

However, unlike the 1831 Act, the 1909 Act did not prohibit authors from assigning away their spouse's or children's renewal rights. As a result, publishers used their superior bargaining position to force authors, and even their spouses and children, to assign their renewal rights to the publisher well before the renewal rights vested. Such efforts to "contract around" renewal rights were controversial, but the practice was affirmed by the Supreme Court in *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 657 (1943) on "freedom of contract" grounds. That decision, and the "freedom of contract" doctrine it supported, significantly undercut the ability of renewal rights to protect authors and their families. *Woods v. Bourne Co.*, 60 F.3d 978, 982 (2d Cir. 1995).

### 3.     Again Protecting Heirs Under The Copyright Act Of 1976

The Copyright Act of 1976 (the "1976 Act") made drastic changes to copyright law. Among other things, the entire statutory "renewal" scheme was abandoned for works created after January 1, 1976, the effective date of the Act. For such post-1978 works, the 1976 Act

provides for one copyright term lasting the life of the author plus seventy years. 17 U.S.C.
§ 302(d).

In addition, for pre-1978 works, which remain subject to the old "renewal" scheme,
Congress created a new statutory right of "termination," embodied in Section 304 of the 1976
Act.[2] First, Section 304(a) grants an additional 19 years of protection to works that were in their
renewal period at the effective date of the Act. 17 U.S.C. § 304(a). As the legislative history
makes clear, these additional years of protection "represent a completely new property
right . . . ." House Report on the Copyright Act of 1976, House Report No. 94-1476 p. 140
(1976).

Second, Congress specifically sought to ensure that authors and their statutory heirs – and
not just prior grantees of copyrights – would benefit from the additional 19 years of protection
granted by Section 304(a). For that reason, Section 304(c) grants authors and their living
spouses and children an inchoate but inalienable property right to "terminate" earlier grants of
copyrights made by them before January 1, 1978 and to do so beginning 56 years after the
copyright was first secured (i.e., upon expiration of both the original and old pre-1978 renewal
term of 28 years each).[3]

In other words, Section 304(c) gives authors or their heirs the absolute right to
"recapture" for the 19 years of extended protection granted by Section 304(a) any copyright
previously granted to third parties before January 1, 1978. 17 U.S.C. § 304(c). As Congress
stated, because Section 304(a) established a new property right in pre-1978 works, "[t]here are

---

[2]       A complete copy of Section 304 is attached as Exhibit A.

[3]       Termination rights can be exercised during a five-year period beginning at the end of this 56 year
period. 17 U.S.C. § 304(c)(3). A notice of such termination must be served no more than ten or less than
two years before termination is to be exercised. Id. § 304(c)(4)(A). Thus, under Section 304(c), a notice
of termination may be served no earlier than 46 years, and no later than 59 years, after copyright was
originally secured.

strong reasons for giving the author [and his or her statutory heirs] . . . an opportunity to share

in" the benefits of continued exploitation of such works by permitting the author or his family to

terminate third party grants. House Report on the Copyright Act of 1976, House Report

No. 94-1476 p. 140 (1976).

To prevent copyright grantees from "contracting around" this new termination right, as

they had with renewal rights, Congress included a provision which statutorily voids any contract

executed prior to such termination that purports to negate termination rights. The 1976 Act thus

provides that "[t]ermination of the grant may be effected *notwithstanding any agreement to the*

*contrary*, including an agreement to make a will or to make any future grant." 17 U.S.C.

§ 304(c)(5); emphasis added. No one, not the author, not statutory heirs, not copyright grantees,

nor anyone else can use an "agreement" to transfer copyrights "contrary" to the copyright

statute's termination provisions. *Id.*[4] Thus, "freedom of contract" is abrogated with regard to

termination rights; such rights may be exercised regardless of contracts which purport to

extinguish them.[5]

The Section 304(c) right is thus inalienable, as the Supreme Court, Second Circuit, and

this Court have all recognized. *Stewart v. Abend*, *supra*, 495 U.S. at 230 ("the 1976 Copyright

Act . . . provides an inalienable termination right"); *Larry Spier, Inc. v. Bourne Co.*, *supra*, 953

F. 2d at 779-780 ("Section 304(c) was drafted so as to leave no doubt about the family's power

to recapture the copyright. Indeed, Section 304(c)(5) expressly provides that termination 'may

be affected notwithstanding any agreement to the contrary'"); *Music Sales Corp. v. Morris*, 73

---

[4]     Statutory "heirs have the right to terminate their assignment of the renewal rights regardless of
whether they made the assignment during the author's life or after the author's death." *Music Sales
Corporation v. Morris*, 73 F.Supp.2d 364, 373 (S.D.N.Y. 1999).

[5]     In fact, copyright termination abrogates freedom of contract in two ways: It invalidates the
original contractual transfer, and it abrogates subsequent attempts to "contract around" the termination
right it creates. 17 U.S.C. § 304(c), (c)(5).

F. Supp. 2d 364, 372 (S.D.N.Y. 1999) ("unlike the renewal rights, the termination right is inalienable. Neither the author nor the statutory heirs may contract away their termination right"). Termination rights remain inalienable until they are exercised by service of a notice of termination. 17 U.S.C. § 304(c)(6)(B); see also id. at § 304(c)(6)(D) (providing that "[a] further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. . . [or] after the notice of termination has been served. . .").[6]

This inalienability is "consistent with the general thrust of Section 304, which is designed to protect the interests of authors and their heirs and to maximize their ability to exploit the value of their [works] during the extended renewal term." *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 24 (2d Cir. 1998). Indeed, "it is evident from the plain language of § 304(c) that the purpose of the statute is to protect the property rights of widows and children in copyrights." *Larry Spier, Inc. v. Bourne Co.*, 953 F. 2d 774, 778 (2d Cir. 1992).[7] In fact, Section 304(c) was enacted "to protect a new family property right . . . ." *Id.*

Viewed against this background, it is apparent why Congress chose to make Section 304's inalienable right of termination applicable to any grant of copyright made prior to January 1, 1978. The January 1, 1978 dividing line was picked because it was the effective date of the 1976 Act. Pre-1978 grants made terminable by Section 304 necessarily involve pre-1978

---

[6]    Once a prior grant of copyrights is terminated, statutory heirs are free to grant these rights to whomever they wish. Such new grants fulfill the purpose of the termination right, which is to provide heirs with an opportunity to negotiate new agreements for previously granted rights. *Nimmer on Copyright*, § 11.01[A].

[7]    Under Section 203 of the 1976 Act, grants made solely by an author *after* January 1, 1978 may be terminated 35 or 40 years after they are made. This Circuit has recognized that the policies underlying Section 203 and 304 termination rights are materially different.. *Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774, 778 (2d Cir. 1992) (Section 304 is "designed to protect a new family property right that does not exist under Section 203").

works, which, under Section 304(a), continue to be burdened by the often ineffective statutory "renewal" scheme. *See* 17 U.S.C. § 304(a). Moreover, virtually all pre-1978 grants were made before Section 304 and its extended 19-year copyright term or its right of termination was enacted in the 1976 Act and before authors or their heirs could have known such rights were going to exist. Thus, the only way to ensure that all authors and their heirs can meaningfully invoke their termination rights with respect to copyrights governed under the old "renewal" scheme was to mandate that such rights applied to all pre-1978 grants and remained inalienable notwithstanding any agreement to the contrary. This mandate ensures fulfillment of the purpose of Section 304 – to allow anyone who granted copyright rights before January 1, 1978 to break free of such grant and freely negotiate a brand new agreement.

### 4.    Protecting Heirs Under The Sonny Bono Copyright Term Extension Act

Congress created an additional termination right in 1998 as part of the Sonny Bono Copyright Term Extension Act (the "CTEA"). First, the CTEA extended the copyright term in certain works by a period of twenty years. *See* 17 U.S.C. §§ 304(a), (b). Second, the CTEA gives authors and their surviving spouses, children and grandchildren who did not exercise their termination rights pursuant to Section 304(c) (*i.e.*, 56 years after copyright was first secured) a second chance to exercise such a termination in certain works within the five year time period beginning 75 years after the creation of the work. 17 U.S.C. § 304(d).[8]

In general, Section 304(d) termination rights operate identically to Section 304(c) termination rights, except that Section 304(d) rights apply to the additional twenty years of the copyright term created by the CTEA in identified works. 17 U.S.C. §§ 304(d)(1), (2).[9] Thus, as

---

[8]    *See* Exhibit A.

[9]    A notice of a termination under Section 304(d) must be served no more than ten and not less than two years before termination is to be exercised. Thus, under Section 304(d), a notice of termination may

with Section 304(c), "[t]ermination of the grant [under Section 304(d)] may be effected *notwithstanding any agreement to the contrary*, including an agreement to make a will or to make any future grant." 17 U.S.C. § 304(d).

### 5.   Thom And Blake Properly Exercised Their Section 304(d) Termination Rights

Thom and Blake, the only living descendants of Steinbeck, timely and properly exercised their inalienable termination rights pursuant to 17 U.S.C. § 304(d).  (Undisputed Fact ¶ 14). Copyrights in the Steinbeck Works were secured between 1929 and 1939, allowing for Section 304(d) termination notices to be served between 1994 and 2017.  Thom and Blake served their termination notice on June 8, 2004.  (*Id.*)  Penguin's complaint does not dispute the timing or substance of Thom's and Blake's termination notice.  (*See* Complaint.)

### B.   The 1994 Agreement Does Not And Cannot Void Thom's and Blake's Inalienable Termination Rights

Penguin's complaint alleges that Thom and Blake have no termination rights because Elaine signed a post-1978 agreement with Penguin in 1994 which purportedly "superceded" John Steinbeck's 1938 grant to Penguin, and therefore "eliminated" the pre-1978 grant that is the legal basis for Thom's and Blake's notice of termination.  Those allegations lack merit because the 1994 Agreement does not purport to affect termination rights, and because under the Copyright Act the 1994 Agreement could not negate termination rights even if it did purport to do so.

### 1.   The 1994 Agreement Expressly Provides that Elaine Retains Her Section 304 Termination Rights

Penguin's post-hoc argument that the 1994 Agreement invalidates Blake's and Thom's Section 304 termination rights, simply because the agreement was entered into after 1978, is contrary to the express terms of this document.

---

be served no earlier than 65 years, and no later than 78 years, after copyright was originally secured. Thom's and Blake's notice of termination was timely under these criteria (Undisputed Fact ¶ 14.)

The 1994 Agreement cannot have negated anyone's Section 304 termination rights (whether Elaine's, Blake's or Thom's) as a matter of law because the copyright interests purportedly granted by that document were granted *subject to* those very same rights. As set forth above, paragraph 9A of the 1994 Agreement expressly recognizes that notwithstanding her entry into the 1994 Agreement, Elaine *retained* her Section 304 termination rights in the Steinbeck Works.

Paragraph 9A thus makes crystal clear Penguin's recognition that Section 304 termination rights could be exercised *after* Elaine had entered into the 1994 Agreement and that the rights granted by Elaine to Penguin in that agreement necessarily were limited by any such subsequent termination. Indeed, paragraph 9A expressly sets forth the consequences – including Penguin's right to recapture money otherwise due to Elaine under the 1994 Agreement – that would befall both Elaine and Penguin if Elaine were to exercise these termination rights and if the "terminating party(ies)" failed to re-grant to Penguin the copyrights in the Steinbeck Works.[10] Paragraph 9A thus simply acknowledges what already was mandated under § 304(c)(6)(D) of the Copyright Act, namely that "[a] further grant, or agreement to make a further grant, of any right covered by a terminated grant *is valid only if it is made after the effective date of the termination. . . [or] after the notice of termination has been served. . .*" (emphasis added). When, as here, the "new" 1994 Agreement arose simultaneously with the "cancellation" – but not a termination – of the 1934 Agreement, the "new" 1994 Agreement remained subject to termination, as Penguin plainly understood.

---

[10]     The 1994 Agreement was reached before Section 304(d) rights were enacted in 1998. Yet both Sections 304(c) and (d) were enacted to invalidate agreements reached before the effective dates of such statutory sections, where such agreements purport to assign rights "contrary" to Section 304(c) and (d) termination rights. It is thus irrelevant that the 1994 Agreement references only Section 304(c) and not 304(d) terminations.

Given the plain language of the 1994 Agreement, Penguin's contention that the 1994

Agreement somehow extinguishes Thom and Blake's termination rights should be rejected as a

matter of law. [11]

### 2. The 1994 Agreement Could Not Affect Termination Rights As A Matter of Copyright Law

Even if the 1994 Agreement purports to affect termination rights despite its clear

contractual language to the contrary (and it does not), it cannot do so as a matter of black letter

copyright law.  First, the 1994 Agreement is not a "new" post-1978 grant of copyright to which

Section 304 does not apply.  Second, the 1994 Agreement is plainly an unenforceable

"agreement to the contrary" barred by Section 304.

### a. A Simultaneous "Cancellation" And "Regrant" Of Copyright Interests Does Not Affect Termination Rights

Penguin seeks to deprive Thom and Blake of their inalienable termination rights by

contending that the 1994 Agreement is a "new" post-1978 grant of copyright to which

Section 304 does not apply.  Specifically, Penguin contends that because the 1994 Agreement

"cancelled and superseded" the original 1934 Agreement, it should be viewed as an entirely new

document, divorced from the original agreement from which it was born.  With the exception of

one inapplicable out-of-Circuit case discussed below, we have found no case (reported or

otherwise) addressing the precise question before this Court, namely, whether an agreement

executed after 1978 that simultaneously "cancels" an pre-1978 agreement and "regrants" the

---

[11]     Indeed, given the express language of paragraph 9A, which envisions a future exercise of
Section 304 termination rights, construing the 1994 Agreement to allow for such exercise is the only way
all of the provisions of the 1994 Agreement can be given force and effect, as they must under New York
law, which controls here.  *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y. 2d 42, 46 (N.Y. App. 1956) (court
must "adopt an interpretation which gives meaning to every provision of a contract . . ."); *Loctite VSI, Inc.
v. Chemfab N.Y. Inc.*, 701 N.Y.S. 2d 723, 725 (N.Y. Sup. Ct. App. Div. 2000) ("courts should adopt an
interpretation of a contract which gives meaning to every provision . . . with no provision left without
force and effect").

same rights conveyed in that earlier document should be treated as a "new" post-1978 grant under Section 304 of the Copyright Act. This is a question of first impression in this Circuit. We submit that Penguin's position should be rejected as a matter of law.

Penguin contends that it can void the rights of Steinbeck's statutory heirs by engaging in the legal fiction of recasting the 1938 Agreement as a "new" 1994 deal. Yet, as demonstrated above, the 1994 Agreement provides for the "continued publication" of the Steinbeck Works – the same rights granted to Penguin under the original 1938 Agreement. While the 1994 Agreement states that it "will cancel and supersede" the 1938 document, it also provides that such cancellation cannot occur unless and until the 1994 Agreement was "signed by [Elaine and Penguin]." Thus, at no point between the "cancellation" of the 1938 Agreement and the signing of the purportedly "new" 1994 Agreement was Elaine free of the 1938 grant.

In these circumstances, the leading treatise on copyright law, *Nimmer on Copyright*, § 11.07 cogently explains why the 1994 Agreement should not be viewed as a new-post-1978 grant for purposes of Section 304 termination rights. As explained in *Nimmer*, to constitute a "new" post-1978 Agreement sufficient to avoid application of Section 304 terminations, there must be "at least a moment when the grantor is bound under neither the prior nor the new grant." *Id.* § 11.07. This is because the whole point of Section 304 is to give the grantor at least one chance to fully revoke a grant given prior to 1978 before entering into any new agreement. *Id.* Certainly, the grantor may choose to enter into a new agreement with the old grantee, but the grantor must first be permitted a "moment of freedom" to refuse to do so and seek out other grantees. *Id.* If the grantor never possesses this "moment of freedom," then the old agreement "remains viable for the purpose of measuring the time until the termination period" because the

"new agreement" is "not a new grant, but only a change in the terms of the old grant." *Nimmer on Copyright,* 11-43.[12]

In reaching this conclusion, *Nimmer* analogizes to basic principles of contract law which recognize that a simultaneous "rescission" of an earlier contract and "regrant" of the same rights governed by such earlier document is simply not a true rescission. *Id.* at 11-42 (8) (citing 1A Arthur L. Corbin, *Corbin on Contracts* § 186 (1963); *see also*, 2 *Corbin on Contracts* § 7.15 (Rev'd ed. 1995)). As *Corbin* explains, when the purported "rescission" and new grant take place simultaneously, it is just as if the parties had said to each other, "I release you but I do not release you." *Corbin on Contracts* § 186, at 161; *Corbin on Contracts* (Rev'd ed.) § 7.15. *Corbin* thus recognizes that in such a situation, there really is no rescission under the law of the original agreement, because there never really is any time at which the parties are relieved of obligations to one another and have the freedom to go their own way. Rather, the purported "rescission" and "regrant" are simply a change in the terms of an old grant. *Id.* The *Restatement (Second) of Contracts* is the same. It describes such a purported rescission as "fictional" because "the 'rescission' and new agreement are simultaneous." *Restatement (Second) of Contracts* § 89 cmt. b.

The United States District Court for the Central District of California reached this same conclusion in *De La Hoya v. Top Rank, Inc.*, 2001 WL 34624886 (C.D. Cal. February 6, 2001), a case that construed California's statutory seven-year time limit on personal services contracts.

---

[12]   We can envision parties entering into numerous types of post-1978 agreements for which this "moment of freedom" may be found. For example, a party could enter into a post-1978 agreement regarding copyrighted works that either never were the subject of any prior agreement (*i.e.,* works that never before were exploited) or were subject to a prior agreement that expired by its own terms. In each of these situations, there would be no need for Section 304 termination rights to apply in order to ensure that the grantor was entering into a post-1978 agreement with full and complete freedom. Of course, neither of those situations is present here.

The Court ruled in *De La Hoya* that a personal services agreement that the boxer Oscar

De La Hoya and his manager entered into in 1992 was void and unenforceable for exceeding

California's statutory seven-year time limit, even though the parties had executed an amendment

to the agreement in 1996, extending its term.  Specifically, the Court rejected the manager's

argument that the extension was really an entirely new contractual relationship which restarted

the seven year period as of 1996.  While the Court found that the 1996 extension merely

amended the existing agreement, and was thus not a new agreement at all, the Court explained

that that was a distinction without a difference.  The critical fact was that De La Hoya never had

a true "moment of freedom" when he was not obligated to the manager.  Thus, the only

agreement that mattered for purpose of the seven-year rule was the original agreement signed by

De La Hoya in 1992.  As the Court stated:

> *The parties to a personal services contract may not evade the seven-year limitation imposed by section 2855(a) simply by signing a mid-term amendment to 'modify their relationship' without providing for a period of freedom or otherwise relieving the talent of its existing obligations.*  The legislative history of section 2855 demonstrates that mid-term contract extensions do not restart the seven-year period even if they are labeled 'amendments' or 'superseding agreements.'

. . . .

> [A]n employee may not be compelled to serve one employer for more than seven years where a subsequent personal services agreement is reached while an original agreement remains in effect and the combined term of both contracts exceeds seven years.  *'A new seven years is not started under the statute unless the new agreement is struck while the employee is free from any existing contract, able to consider competitive offers and able to negotiate for his true value in the marketplace.'*

. . . .

> The Court finds that the January 1996 Amendment did not create a 'break in privity' between De La Hoya and [the manager].  Each of the extensions of the September 1992 Agreement reaffirmed De La Hoya's duty to provide boxing services to [the manager] and occurred while he remained subject to that contract.

18

2001 WL 34624886 * p. 12-14 (emphasis added) (internal citations omitted)

The reasoning of *De La Hoya* is equally applicable here. It is undisputed that Elaine never had a "moment of freedom" before executing the 1994 Agreement because that agreement "cancelled and superceded" the 1938 Agreement only <u>after</u> the 1994 Agreement was fully signed. Thus, Penguin always retained control of the Steinbeck Works, and Elaine never was truly free to negotiate a new deal with that company or anyone else.

Under these circumstances it would be inequitable even to construe the 1994 document as precluding Elaine (if she were still alive) from exercising her termination rights. The inequity of voiding Thom and Blake's termination rights by such a legal fiction is even worse. *Nimmer* foresaw this possibility in a hypothetical eerily reminiscent of the facts of this case:

> Suppose, for example, that the author's widow is the sole beneficiary of his estate, and that his three children (perhaps by prior marriage) take nothing from the estate. Under an original grant executed by the author. . . his widow, as sole beneficiary, received all the royalties from the sale of his book. If there were to be a statutory termination, thereafter the widow would be entitled to only one-half of the royalties accruing from a newly-executed (post-termination) grant, while the three children would be entitled to divide the remaining half. If, however, . . . the widow (on behalf of the estate) and the publisher were to agree to mutually rescind the old publication contract, and substitute a new contract under which the widow would again be the exclusive recipient of royalties, this would effectively preclude the children from terminating the original grant since it would have been previously terminated by mutual rescission. . . *But if a motivation to voluntarily terminate exists whenever those claiming under the author's estate and those entitled to statutory termination are not identical, there remains a question as to the legal efficacy of any such voluntary termination.*

*Nimmer on Copyright* § 11.07. at 11-41 n.7; emphasis added.

Here, the situation is even worse than the one posed by *Nimmer*. Unlike that situation, Elaine and Penguin did *not* agree to enter into a new agreement purporting to extinguish Section 304 termination rights. To the contrary, the 1994 Agreement expressly *preserves* these

rights. For this reason, and the reasons set forth above, this Court should find that the 1994

Agreement is not a "new" post-1978 Agreement that deprives Thom and Blake of their

inalienable Section 304(d) termination rights.

Nevertheless, we expect that Penguin will rely on *Milne v. Slesinger*, 2003 WL 21076983

(C.D. Cal., May 8, 2003) in urging this Court to reach a contrary holding. That case, however,

actually proves our point – that because the 1994 Agreement *preserved* Elaine's Section 304

termination rights, it cannot be used to destroy those rights.

The plaintiffs in *Milne* were Christopher and Clare Milne, the son and granddaughter,

respectively, of A.A. Milne, the author of the classic "Winnie-The-Pooh" books. In 1930, A.A.

Milne granted the copyrights to these works to Stephen Slesinger.[13]  *Milne*, 2003 WL 21076983

*p. 2.

In 1983, Plaintiffs and Slesinger entered into another agreement regarding the Milne

works. That later agreement revoked the original 1930 grant and re-granted those rights to

Slesinger. The question before the *Milne* Court, as here, was whether the later 1983 agreement

should be treated as a pre- or post-1978 agreement for purposes of Section 304. The *Milne* Court

held that the agreement was a post-1978 agreement under Section 304 because Plaintiff

Christopher Robin Milne expressly agreed in the 1983 agreement both that this document was a

"new agreement" not subject to Section 304 and that he would not, in fact, ever seek to exercise

termination rights under that provision. Specifically, the Court found that

> The agreement recognized that, as the author's heir, Christopher
> Robin Milne could have had a right of termination [over the
> original 1930 Agreement] under Section 304(c) of the Copyright
> Act [but that] by executing the Agreement, however, *Christopher*

---

[13]     Walt Disney Productions entered into agreements with both Slesinger and Milne's widow.
However, Walt Disney's role in the *Milne* case is immaterial to the question before this Court, so for the
sake of convenience and clarity, our discussion proceeds as if Walt Disney was not a party to that case.

> *Robin Milne agreed not to exercise that right*;
>
> . . . .
>
> Significantly, the parties described their 1983 agreement as a "new agreement for the future *which the parties believe would not be subject to any right of termination under 17 U.S.C. Secs. 203 or 304(c)*."

*Milne*, \*p.4 (emphasis added).[14]

Neither of these two critical facts are present here. To the contrary, rather than relinquishing them, as Christopher Robin Milne did, the 1994 Agreement expressly *reserves* Elaine's termination rights. For this reason, *Milne* requires that this Court find that the 1994 Agreement, unlike the 1983 agreement at issue in *Milne*, is not a new-post-1978 grant and does not extinguish Thom and Blake's termination rights.

> **b.    The 1994 Agreement Is "An Agreement To The Contrary" Barred By Section 304(c)(5) To The Extent It Purports To Affect Termination Rights**

Penguin's claim that its 1994 Agreement made Steinbeck's 1938 grant a 1994 grant for termination purposes is a transparent legal fiction, and a *post-hoc* attempt to "contract around" termination rights, as was done with renewal rights. Such a result is barred by the plain language of 17 U.S.C. § 304(c)(5), which provides that "[t]ermination of the [1938] grant may be effected notwithstanding any agreement to the contrary . . ." *See also* 17 U.S.C. § 304(d)(1) (incorporating § 304(c)(5) to the newly created § 304(d) termination right). The 1994 Agreement obviously is an "agreement" which Penguin now claims granted it rights "contrary" to Section 304(c)(5) and (d)(1). The statute's clear prohibition must be given effect to bar such a

---

[14]    Thom and Blake respectfully disagree with the *Milne* court's reliance on these facts, since it amounts to reliance on an "agreement to the contrary" in contravention of 17 U.S.C. §§ 304(c) and (d) and the *Marvel* and other authority cited *infra*. However, the absence of those facts here makes this case readily distinguishable from *Milne*.

contractual interpretation. *State Street Bank And Trust Co. v. Salovdara*, 326 F.2d 130, 39 (2d Cir. 2003) ("It is our duty to give effect, if possible, to every clause and word of a statute.")

Penguin's alleged effort to "contract around" termination rights is precisely what the termination statute prohibits. The Second Circuit has twice rejected similar efforts to contract around termination rights, and has broadly applied the statutory prohibition of Section 304 to invalidate such unlawful contracts.

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002), reversed a summary judgment for a copyright grantee and held that the author of the *Captain America* comic books was not precluded from serving a 1999 notice of termination on copyright owner Marvel by a 1969 settlement agreement the author executed. The author had sued Marvel over ownership of *Captain America* in the 1960s, and settled the action by entering into an agreement in which he admitted he had written *Captain America* as a work made for hire. That admission was significant because works made for hire are not subject to termination. 17 U.S.C. § 304(c).

The Second Circuit rejected an argument that the 1969 settlement agreement bound the author and precluded his filing a notice of termination 30 years later. Holding that the settlement agreement was an "agreement to the contrary" barred by Section 304(c)(5), the Court stated:

> If an agreement between an author and publisher that a work was created for hire were outside the purview of Section 304(c)(5), the termination provision would be rendered a nullity; litigation-savvy publishers would be able to utilize their superior bargaining position to compel authors to agree that a work was created for hire in order to get their works published. In effect, such an interpretation would likely repeat the result brought by the *Fred Fisher* decision and provide a blueprint by which publishers could effectively eliminate an author's termination right. We conclude that Congress included the 'notwithstanding any agreement to the contrary' language in the termination provision precisely to avoid such a result.

*Id.* at 290-291.

*Larry Spier v. Bourne Co.*, 953 F.2d 774 (2d Cir. 1992), reversed summary judgment for a copyright grantee and rejected an argument that the reiteration of an *inter vivos* grant by the author in the author's will voided statutory heirs' termination rights, even though Section 304(c) termination only applies to transfers "otherwise then by will." 17 U.S.C. § 304(c). Liberally construing Section 304(c) to protect statutory heirs, the Second Circuit held that the author had granted all rights to the copyright grantee while he was alive, and thus had nothing left to grant by will, stating:

> [I]t is evident from the plain language of Section 304(c) that the purpose of the statute is to protect the property rights of widows and children in copyrights. The provision addresses little other than the rights of these persons to terminate assignments of copyrights made by the spouse and parent, and to recapture the copyrights for themselves. . . Section 304(c) is not necessarily a provision for the effectuation of the author's "intent."

953 F.2d at 778.

*Music Sales Corporation v. Morris, supra*, 73 F. Supp. 2d at 373, 377, also recognized that termination rights should be liberally protected, and determined that an instrument which purported to transfer rights "contrary" to the termination provisions was ineffective. In that case, the defendant Morris had sued a predecessor of the plaintiff, seeking to rescind a prior grant to the predecessor of copyrights in musical works written by Billy Strayhorn. Morris, plaintiff and plaintiff's predecessor all signed a settlement agreement in 1993, pursuant to which, among other things, plaintiff received a 50% interest in the Strayhorn works and paid Morris $350,000. Five and six years later, in 1998 and 1999, Morris served plaintiff with notices of termination covering the same works governed by the earlier settlement agreement. The Court held that the notices were valid.[15]

---

[15]    In addition to the 1998 and 1999 termination notices, *Music Sales* involved a third notice served before the 1993 settlement agreement was executed. The *Music Sales* court noted that if the settlement

As interpreted by Penguin, the 1994 Agreement is even more obviously an unenforceable "agreement to the contrary" than the agreements or instrument in the above cases, because none of the mitigating factors present in those cases is present here. The *Marvel* agreement was entered into in good faith in 1969; there could have been no intent to "contract around" termination provisions, which were not created until 1976. *Marvel* and *Music Sales* both involved settlement agreements, which public policy favors. *See, e.g.*, *Edwards v. Born, Inc.*, 792 F.2d 387, 390 (3d Cir. 1986)("A strong public policy exists in favor of settlements.") The *Marvel, Larry Spier* and *Music Sales* courts nevertheless all correctly recognized that the settlement agreements or will provision before them could not bar termination because they were "agreements to the contrary" prohibited by the termination statute.

Here there is no public policy-favored settlement agreement. Here there is, in contrast, a self-serving reinterpretation of a 10 year old private agreement that is contrary to its plain language. Here there is, further, an agreement reached after Thom's and Blake's termination rights were created, by a party with a motive to "contract around" them for its own benefit. If the "notwithstanding any agreement to the contrary" language applies to any agreement, it should apply to the 1994 Agreement here.

Just as a copyright grantee cannot avoid termination rights by agreeing that a work is really a work made for hire after the work was created (*Marvel*), or obtaining a reconveyance of previously granted rights by will (*Larry Spier*), or entering into post-1978 agreements which affect interests in later terminated works (*Music Sales*), Penguin cannot rely on a pretense that its

---

agreement was a new conveyance of rights entered into after termination, then the prior notice of termination could not be used to nullify the settlement agreement. That result is consistent with the termination provisions of the Copyright Act, which contemplates entering into new and binding agreements post termination. 17 U.S.C. § 304(c)(6) . Here of course, the 1994 Agreement was entered into before any exercise of termination rights.

1938 Agreement was really executed after 1978 by reexecuting an agreement for the same rights

in 1994.  Adopting Penguin's position would "repeat the result brought by the *Fred Fisher*

decision and provide a blueprint by which publishers could effectively eliminate an author's

termination right." *Marvel, supra,* at 290-91.

## IV.   CONCLUSION

Thom's and Blake's motion should be granted for all the reasons described above.

Dated: New York, New York.
      November 29, 2004

Manatt, Phelps & Phillips, LLP


By:    /s/  Cynthia S. Arato

      Cynthia S. Arato (CA 8350)
      7 Times Square, 22nd Floor
      New York, NY  10036
      (212) 790-4500

      Mark S. Lee (Bar No. CA 094103, Admitted Pro
      Hac Vice)
      Beverly R. Frank (BF 3087)
      11355 West Olympic Boulevard
      Los Angeles, CA  90064-1614
      (310) 312-4000

      Attorneys for Defendants
      THOMAS STEINBECK and BLAKE SMYLE

80318271.2

identify the person filing it, the nature of that person's interest, and the source of the information recorded, and shall comply in form and content with requirements that the Register of Copyrights shall prescribe by regulation. The Register shall maintain current records of information relating to the death of authors of copyrighted works, based on such recorded statements and, to the extent the Register considers practicable, on data contained in any of the records of the Copyright Office or in other reference sources.

(e) PRESUMPTION AS TO AUTHOR'S DEATH.—After a period of 95 years from the year of first publication of a work, or a period of 120 years from the year of its creation, whichever expires first, any person who obtains from the Copyright Office a certified report that the records provided by subsection (d) disclose nothing to indicate that the author of the work is living, or died less than 70 years before, is entitled to the benefit of a presumption that the author has been dead for at least 70 years. Reliance in good faith upon this presumption shall be a complete defense to any action for infringement under this title.

## § 303 · Duration of copyright: Works created but not published or copyrighted before January 1, 1978[5]

(a) Copyright in a work created before January 1, 1978, but not theretofore in the public domain or copyrighted, subsists from January 1, 1978, and endures for the term provided by section 302. In no case, however, shall the term of copyright in such a work expire before December 31, 2002; and, if the work is published on or before December 31, 2002, the term of copyright shall not expire before December 31, 2047.

(b) The distribution before January 1, 1978, of a phonorecord shall not for any purpose constitute a publication of the musical work embodied therein.

## § 304 · Duration of copyright: Subsisting copyrights[6]

(a) COPYRIGHTS IN THEIR FIRST TERM ON JANUARY 1, 1978.—

(1)(A) Any copyright, in the first term of which is subsisting on January 1, 1978, shall endure for 28 years from the date it was originally secured.

(B) In the case of—

(i) any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or

(ii) any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire,

EXHIBIT A

the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of 67 years.

(C) In the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work—

   (i) the author of such work, if the author is still living,

   (ii) the widow, widower, or children of the author, if the author is not living,

   (iii) the author's executors, if such author, widow, widower, or children are not living, or

   (iv) the author's next of kin, in the absence of a will of the author, shall be entitled to a renewal and extension of the copyright in such work for a further term of 67 years.

(2)(A) At the expiration of the original term of copyright in a work specified in paragraph (1)(B) of this subsection, the copyright shall endure for a renewed and extended further term of 67 years, which—

   (i) if an application to register a claim to such further term has been made to the Copyright Office within 1 year before the expiration of the original term of copyright, and the claim is registered, shall vest, upon the beginning of such further term, in the proprietor of the copyright who is entitled to claim the renewal of copyright at the time the application is made; or

   (ii) if no such application is made or the claim pursuant to such application is not registered, shall vest, upon the beginning of such further term, in the person or entity that was the proprietor of the copyright as of the last day of the original term of copyright.

(B) At the expiration of the original term of copyright in a work specified in paragraph (1)(C) of this subsection, the copyright shall endure for a renewed and extended further term of 67 years, which—

   (i) if an application to register a claim to such further term has been made to the Copyright Office within 1 year before the expiration of the original term of copyright, and the claim is registered, shall vest, upon the beginning of such further term, in any person who is entitled under paragraph (1)(C) to the renewal and extension of the copyright at the time the application is made; or

   (ii) if no such application is made or the claim pursuant to such application is not registered, shall vest, upon the beginning of such further term, in any person entitled under paragraph (1)(C), as of the last day of the original term of copyright, to the renewal and extension of the copyright.

(3)(A) An application to register a claim to the renewed and extended term of copyright in a work may be made to the Copyright Office—

(i) within 1 year before the expiration of the original term of copyright by any person entitled under paragraph (1)(B) or (C) to such further term of 67 years; and

(ii) at any time during the renewed and extended term by any person in whom such further term vested, under paragraph (2)(A) or (B), or by any successor or assign of such person, if the application is made in the name of such person.

(B) Such an application is not a condition of the renewal and extension of the copyright in a work for a further term of 67 years.

(4)(A) If an application to register a claim to the renewed and extended term of copyright in a work is not made within 1 year before the expiration of the original term of copyright in a work, or if the claim pursuant to such application is not registered, then a derivative work prepared under authority of a grant of a transfer or license of the copyright that is made before the expiration of the original term of copyright may continue to be used under the terms of the grant during the renewed and extended term of copyright without infringing the copyright, except that such use does not extend to the preparation during such renewed and extended term of other derivative works based upon the copyrighted work covered by such grant.

(B) If an application to register a claim to the renewed and extended term of copyright in a work is made within 1 year before its expiration, and the claim is registered, the certificate of such registration shall constitute prima facie evidence as to the validity of the copyright during its renewed and extended term and of the facts stated in the certificate. The evidentiary weight to be accorded the certificates of a registration of a renewed and extended term of copyright made after the end of that 1-year period shall be within the discretion of the court.

(b) Copyrights in Their Renewal Term at the Time of the Effective Date of the Sonny Bono Copyright Term Extension[7] — Any copyright still in its renewal term at the time that the Sonny Bono Copyright Term Extension Act becomes effective shall have a copyright term of 95 years from the date copyright was originally secured.[8]

(c) Termination of Transfers and Licenses Covering Extended Renewal Term. — In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by a person or persons other than the author, termination of the grant may be effected by the surviving person or persons who executed it. In the case of a grant executed by one or more of the

authors of the work, termination of the grant may be effected, to the extent of a particular author's share in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

(C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

(4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

(A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2), and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

(B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

(6) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this subsection. In all cases the reversion of rights is subject to the following limitations:

(A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

(B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of this subsection.

(C) Where the author's rights revert to two or more persons under clause (2) of this subsection, they shall vest in those persons in the proportionate shares provided by that clause. In such a case, and subject to the provisions of subclause (D) of this clause, a further grant, or agreement to make a further grant, of a particular author's share with respect to any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under this clause, as are required to terminate the grant under clause (2) of this subsection. Such further grant or agreement is effective with respect to all of the persons in whom the right it covers has vested under this subclause, including those who did not join in signing it. If any person dies after rights under a terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this subclause.

(D) A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the author or any of the persons

prov
the p
or su
serve

(E
cover
arisin

(F)
grant,
der of

(d) TERM
PIRED ON O
TERM EXTEN
hire, subsisti
right Term I
tion (c) has e
right has not
exclusive gra
der it, execut
section (a)(1)(
the following

(1) The
this sectio
provided b
tension Ac

(2) Tern
of 5 years b
nally securc

## § 305 · Dura

All terms of cc
the calendar ye

## Chapter 3 · E

1. Private Law

[A]ny provisic
the trustees un
"Science and F

provided by the first sentence of clause (6) of this subsection, or between the persons provided by subclause (C) of this clause, and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of this subsection.

(E) Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

(F) Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.

(d) TERMINATION RIGHTS PROVIDED IN SUBSECTION (c) WHICH HAVE EXPIRED ON OR BEFORE THE EFFECTIVE DATE OF THE SONNY BONO COPYRIGHT TERM EXTENSION ACT. — In the case of any copyright other than a work made for hire, subsisting in its renewal term on the effective date of the Sonny Bono Copyright Term Extension Act[9] for which the termination right provided in subsection (c) has expired by such date, where the author or owner of the termination right has not previously exercised such termination right, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated in subsection (a)(1)(C) of this section, other than by will, is subject to termination under the following conditions:

(1) The conditions specified in subsections (c) (1), (2), (4), (5), and (6) of this section apply to terminations of the last 20 years of copyright term as provided by the amendments made by the Sonny Bono Copyright Term Extension Act.

(2) Termination of the grant may be effected at any time during a period of 5 years beginning at the end of 75 years from the date copyright was originally secured.

## § 305 · Duration of copyright: Terminal date

All terms of copyright provided by sections 302 through 304 run to the end of the calendar year in which they would otherwise expire.

## Chapter 3 · Endnotes

1. Private Law 92-60, 85 Stat. 857, effective December 15, 1971, states that:

[A]ny provision of law to the contrary notwithstanding, copyright is hereby granted to the trustees under the will of Mary Baker Eddy, their successors, and assigns, in the work "Science and Health with Key to the Scriptures" (entitled also in some editions "Science