UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

PENGUIN GROUP (USA) INC.,                          :

                Plaintiff,                 :

      -against-                                :   **No. 04-CV-6795 (RO)**

**THOMAS STEINBECK and BLAKE SMYLE,**              :   **ECF CASE**

             Defendants.                 :

                                             :

                                             :

------------------------------------------------------------------------ x

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Richard Dannay (RD-9407)
Thomas Kjellberg (TK-0605)
COWAN, LIEBOWITZ & LATMAN, P.C.
1133 Avenue of the Americas
New York, N.Y. 10036-6799
Phone (212) 790-9200
Attorneys for Plaintiff

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................. 1

I.   BACKGROUND ......................................................................................... 1

    A.   The Parties ....................................................................................... 1

    B.   The Works at Issue .......................................................................... 1

    C.   History of the Reversion and Termination-of-Transfers Provisions of the Copyright Act .................................................................................. 2

    D.   The Termination Provisions of the Copyright Act of 1976 ............ 5

    E.   The 1994 Agreement ....................................................................... 8

    F.   Thom and Blake's Notice of Termination Under the Sonny Bono Act ............ 10

II.  NEITHER THE CONTRACTUALLY TERMINATED 1938 AGREEMENT NOR THE 1994 AGREEMENT IS SUBJECT TO TERMINATION UNDER SECTION 304(D) ............................................................................................. 11

    A.   The 1938 Agreement Cannot Be Terminated Because It Was Validly Terminated By Contract In 1994 ...................................................... 12

    B.   The Legislative History Shows That Congress Anticipated and Approved Agreements Such As the 1994 Agreement ............................................ 13

    C.   Termination Rights Are a Limited Exception To Freedom of Contract, Not a Sweeping Abrogation ............................................................. 17

III. THE 1994 AGREEMENT IS A VALID TERMINATION AND NOVATION UNDER THE RELEVANT LAW, NEW YORK LAW, WHICH DOES NOT REQUIRE THAT A "MOMENT OF FREEDOM" BE INTERPOSED ............ 19

IV.  THE 1994 AGREEMENT IS NOT AN "AGREEMENT TO THE CONTRARY" UNDER THE COPYRIGHT ACT ................................................................ 30

CONCLUSION ................................................................................................... 38

# TABLE OF AUTHORITIES

**Cases**

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 491 F. Supp. 1320 (S.D.N.Y. 1980) .......................... 7

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ......................................... 13

*De Haviland v. Warner Bros. Pictures*, 67 Cal.App.2d 225, 153 P.2d 983 (1944) ..................... 24

*De La Hoya v. Top Rank, Inc.*, 2001 U.S. Dist. LEXIS 25816 (C.D. Cal. Feb. 6, 2001) ................................................................................................................................... 23

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ................................................................................... 14

*Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943) ............................................. 3

*Garcia v. United States*, 469 U.S. 70 (1984) ............................................................................... 14

*Green v. Doniger*, 300 N.Y. 238 (1949) ...................................................................................... 22

*Harry Fox Agency, Inc. v. Mills Music, Inc.*, 543 F. Supp. 844 (S.D.N.Y. 1982) ...................... 14

*Jones v. Trice*, 202 A.D.2d 394, 608 N.Y.S.2d 688 (2d Dep't 1994) .......................................... 22

*Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774 (2d Cir. 1992) ...................................................... 32

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) .......................................... passim

*Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373 (1960) .......................................... 4

*Milne v. Stephen Slesinger, Inc.*, 2003 U.S. Dist. LEXIS 7942 (C.D. Cal. 2003) ............ 26, 28, 36

*Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364 (S.D.N.Y. 1999) ............................................ 33

*Nat'l R.R. Passenger Corp. v. Nat'l Assoc. of R.R. Passengers*, 414 U.S. 453 (1974) ................................................................................................................................... 14

*Schwartzreich v. Bauman-Basch, Inc.*, 231 N.Y. 196 (1921) ...................................................... 22

*Stewart v. Abend*, 495 U.S. 207 (1990) ......................................................................................... 4

*Woods v. Bourne Co.*, 60 F.3d 978 (2d Cir. 1995) .................................................................. 3, 11

**Federal Statutes and Legislative Materials**

17 U.S.C. § 101 ............................................................................................................................ 18

17 U.S.C. § 203 ..................................................................................................................... passim

17 U.S.C. § 24 ................................................................................................................................ 2

17 U.S.C. § 302 .............................................................................................................................. 4

17 U.S.C. § 304(c) ................................................................................................................. passim

17 U.S.C. § 304(d) .............................................................................................................. 1, 10, 18

H.R. Rep. No. 60-2222 (1909) ...................................................................................................... 2

H.R. Rep. No. 90-83 (1967) ........................................................................................................ 21

H.R. Rep. No. 94-1476 (1976)............................................................................ passim

House Comm. on Judiciary, 87th Cong., Report of the Register of Copyrights on
the General Revision of the U.S. Copyright Law (Comm. Print 1961) ................................... 3, 5

House Comm. on Judiciary, 89th Cong., Supplementary Report of the Register of
Copyrights on the General Revision of the U.S. Copyright Law (Comm. Print
1965).................................................................................................. 15, 16, 19, 21

S. Rep. No. 104-315 (1996)................................................................................ 17

S. Rep. No. 94-473 (1975)............................................................................... 5, 15

**Other Authorities**

Barbara Ringer, "Finding Your Way Around in the New Copyright Law,"
Publishers Weekly, Dec. 13, 1976....................................................................... 29

Frank R. Curtis, *Caveat Emptor in Copyright: A Practical Guide to the
Termination-of-Transfers Provisions of the New Copyright Code*, 25 Bull.
Copyright Soc'y U.S.A. 19 (1977) ................................................................ 21, 26, 29

Frank R. Curtis, *Protecting Authors in Copyright Transfers:  Revision Bill § 203
and the Alternatives*, 72 Colum. L. Rev. 799 (1972) .............................................. 13, 21

Melville B. Nimmer, *Termination of Transfers Under the Copyright Act of* 1976,
125 U. Pa. L. Rev. 947 (1977).......................................................................... 14

Merriam Webster's Collegiate Dictionary (10th Ed. 1997).............................................. 23

Pierre Leval & Lewis Liman, *Are Copyrights for Authors or Their Children?*, 39
J. Copyright Soc'y USA 1 (1991) .................................................................... 4, 31

Restatement (Second) of Contracts...................................................................... 23

**Treatises**

Arthur L. Corbin, *Contracts* (1963)............................................................ 20, 22, 23

Howard B. Abrams, *The Law of Copyright* (2002) ...................................................... 17

Joseph M. Perillo & Helen H. Bender, *Corbin on Contracts* (Rev. ed. 1995 and
2002 Supp.) ............................................................................................ 23

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2001) ................................. passim

Paul Goldstein, *Copyright* (2d ed., 2004 Supp.)........................................... 5, 10, 12, 15

**State Statutes**

Cal. Labor Code § 2855(a).............................................................................. 23

## INTRODUCTION

In this action plaintiff Penguin Group (USA) Inc. ("Penguin") seeks a declaration that a termination notice served on Penguin by Thom Steinbeck and Blake Smyle purporting to terminate "grants made … before January 1, 1978" is invalid because the grants in question were voluntarily terminated in 1994 by Elaine Steinbeck, who owned the rights in question, and who then entered into a new publishing agreement with Penguin covering the works in question that is not subject to termination under Section 304(d) of the Copyright Act, 17 U.S.C. § 304(d). Penguin submits this brief in support of its motion under Fed. R. Civ. P. 56 for summary judgment and in opposition to defendants' motion for summary judgment dismissing the Complaint.

## I.     BACKGROUND

### A.     The Parties

Plaintiff Penguin Group (USA) Inc. is the U.S. arm of the internationally renowned Penguin Group, a leading United States trade book publisher and the second-largest English-language trade book publisher in the world.  Penguin possesses one of the world's most prestigious lists of best-selling authors, including John Steinbeck, the winner of the 1962 Nobel Prize in Literature, and the author of the works involved in this case.  Defendant Thomas Steinbeck ("Thom") is the child of John Steinbeck.  Defendant Blake Smyle ("Blake") is the grandchild of John Steinbeck.

### B.     The Works at Issue

In an agreement dated September 12, 1938 (the "1938 Agreement"), Ex. A, John Steinbeck granted to Penguin's predecessor The Viking Press, Inc. exclusive publication rights in *The Long Valley* (including all 13 short stories therein).  The 1938 Agreement by its terms

1

"supersede[d] all previous agreements made between The Viking Press, Inc. and John Steinbeck," and also applied to "all the previously published books of John Steinbeck": *Cup of Gold*; *The Pastures of Heaven*; *To A God Unknown*; *Tortilla Flat*; *In Dubious Battle*; *Of Mice and Men*; *Of Mice and Men* (Play); *The Red Pony*, and the three stories included therein, "The Gift," "The Great Mountains" and "The Promise."  Ex. A ¶ 13A.

Four additional works by John Steinbeck were added to the 1938 Agreement by way of its option clause, Ex. A ¶ 6, including *The Grapes of Wrath*, the latest of the works at issue here, in 1939.  The 1938 Agreement was not a lump-sum transfer but provided for ongoing royalties based on net sales, and was periodically amended as to some or all of the Works.

John Steinbeck renewed the copyrights in each of the ten works in question (the "Works") during his lifetime, and when he died in 1968, he bequeathed the copyrights in the Works to his widow Elaine Steinbeck.

### C.   History of the Reversion and Termination-of-Transfers Provisions of the Copyright Act

Under the predecessor Copyright Act of 1909 (the "1909 Act") an author was entitled to a copyright in a work for 28 years from the date the copyright was secured, usually the date of first publication.  17 U.S.C. § 24, repealed by Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "1976 Act").  *See* H.R. Rep. No. 94-1476 at 133-34 (1976) (hereinafter "House Report"), *reprinted in* 1976 U.S.C.C.A.N. 5659.  On the expiration of the initial 28-year term, the author could renew the copyright for a second 28-year "renewal term" by applying to the Copyright Office.  The renewal system under the 1909 Act had a dual purpose:  to allow copyright to lapse after 28 years in works for which protection was no longer desired, thereby enriching the public domain, H.R. Rep. No. 60-2222, at 14 (1909); and to afford certain authors of successful works a second chance to profit from the sale of rights:

> It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum.  If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law should be framed as is the existing law, so that he could not be deprived of that right.

*Id*.  The "primary purpose" of the reversion-on-renewal scheme of the 1909 Act "was to protect the author and his family against his unprofitable or improvident disposition of the copyright." House Comm. on Judiciary, 87th Cong., Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law 53 (Comm. Print 1961) (hereinafter "Register's Report"). The renewal scheme was intended "to alleviate the problem of the inability of authors to know the true monetary value of their works prior to commercial exploitation," *Woods v. Bourne Co.*, 60 F.3d 978, 982 (2d Cir. 1995), by affording a second chance to negotiate transfers and licenses at a point when the commercial value of a work was known.

However, "the reversionary purpose of the renewal provision [was] thwarted to a considerable extent," Register's Report 53, after the Supreme Court held that an author's assignment of future renewal rights during the initial copyright term was binding if the author lived to the end of the initial 28-year term, and renewal registration was then made in his name. *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 656-59 (1943).  After *Fred Fisher*, some "publishers began to insist that authors assign both their initial and renewal rights to them in one transfer," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 284 (2d Cir. 2002), effectively "eliminating" the renewal rights of such authors under the 1909 Act, *id*.[1]

On the other hand, the Supreme Court interpreted the renewal provision of the 1909 Act as providing that where the author died prior to the vesting of the renewal term, such a

---

[1] No such advance assignment of the renewal rights in the Works appears in any contract in question here.

3

"prematurely deceased" author's statutory successors (widow or children) would take the renewal term regardless of the author's prior assignment or testamentary disposition to another. *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373 (1960); *Stewart v. Abend*, 495 U.S. 207 (1990).[2]

In the 1976 Act Congress eliminated the renewal scheme altogether for works created on or after January 1, 1978, and extended the term of protection for such works to the life of the author plus 50 years. 17 U.S.C. § 302 (as originally enacted). For existing pre-1978 copyrights, however, the 1976 Act retained the original term of protection running from the date of publication, but increased the renewal term from 28 to 47 years, for a total term of 75 years. 17 U.S.C. § 304 (as originally enacted). The legislative history explains that the renewal scheme was retained for pre-1978 works because "[a] great many of the present expectancies in these

---

[2] The 1909 Act's renewal provision "[o]n its face … manifests no intention to deal with the problem of priority of rights as between an assignee and persons named in the section." *Miller Music*, 362 U.S. at 380 (Harlan, J., dissenting.) And as a leading commentator notes, in *Miller Music*, the Court in fact did not deal directly with the question of priority between an assignee and the statutory successors, but "simply assumed (on counsel's concession) that the prime statutory successors (widow or children) would take the renewal term if living, notwithstanding the author's prior assignment to a third party." Pierre Leval & Lewis Liman, *Are Copyrights for Authors or Their Children?*, 39 J. Copyright Soc'y USA 1, 2 (1991) (hereinafter "Leval"). Thirty years later, in *Stewart v. Abend*, 495 U.S. 207 (1990), "the majority opinion built on the rule assumed in *Miller Music* that statutory successors take the renewal term notwithstanding a prior assignment (or contrary testamentary disposition) by a prematurely deceased author." Leval, at 2.

Judge Leval questions the constitutionality of this assumed priority of statutory successors over the author's chosen legatees or assignees ("Surely, if the task undertaken is to 'secur[e] … to Authors … the exclusive Right to their … Writings,' an approach which nullifies th[e] expressed gifts, wills and contractual assignments of the author, imposing statutorily mandated choices on her, is odd at best," *id.* at 9), and concludes that "[a]n interpretation that permitted authors to exercise control over the licensing of their own works in the renewal term, notwithstanding premature death, would certainly have better supported the constitutional objective of promoting the progress of knowledge than an interpretation that protects the eventual rights of unknown statutory successors against any interference by the author." *Id.* at 16.

4

cases are the subject of existing contracts, and it would be unfair and immensely confusing to cut off or alter these interests."  House Report at 139.

In sections 203 and 304(c) of the 1976 Act Congress, with the view that "provision should be made to permit [authors] to renegotiate transfers that do not give them a reasonable share of the economic returns from their works," Register's Report at 92, attempted to create "provision[s] safeguarding authors against unremunerative transfers," House Report at 124, 140; S. Rep. No. 94-473 at 108, 123 (1975) (hereinafter "Senate Report"); Paul Goldstein, *Copyright* § 4.10, at 4:190-91 (2d ed., 2004 Supp.) (hereinafter "*Goldstein*"), and implemented a system by which authors or their statutorily designated successors are given an opportunity to terminate earlier transfers of rights.  Which provision may apply depends on when the transfer was executed, and by whom.

>    **D.**    **The Termination Provisions of the Copyright Act of 1976**

Under section 203 of the 1976 Act, a grant of rights in a copyrighted work "executed by the author on or after January 1, 1978" may be terminated at any time during a five-year window beginning 35 years after the date of execution of the grant.  17 U.S.C. § 203.

Section 304 governs pre-1978 transfers.  Section 304(c) provides that those owning the "termination interest" may terminate grants "executed before January 1, 1978" with respect to works in copyright on January 1, 1978 during "a period of five years beginning at the end of fifty-six years from the date copyright was originally secured …."  17 U.S.C. § 304(c)(3).  All of the termination rights are optional, not mandatory or automatic.  If termination is desired, it is to be effected by serving "advance notice" of the termination on the grantee or its successor "not less than two or more than ten years before" the effective date.  17 U.S.C. § 304(c)(4)(A).  The statute thus affords the owners of the termination right—the author, or a deceased author's

5

spouse, children and/or grandchildren, 17 U.S.C. § 304(c)(2)—a 13-year "window of opportunity" in which to serve a notice of termination, with the rights that are to revert vesting in the owners of the termination interest on the date the notice is served.  17 U.S.C. § 304(c)(6)(B).

Under section 304(c) the termination rights owners could have terminated each of the grants of rights in the Works made by John Steinbeck in the 1938 Agreement by serving notice on Penguin up to 10, but not less than two, years before effective dates falling within five-year periods, as follows:

6

| Work | Date Copyright Secured | First Date For Service of Notice | Last Date For Service of Notice | Termination Period |
|---|---|---|---|---|
| *Cup of Gold* | August 2, 1929 | January 1, 1978[3] | August 1, 1988 | August 2, 1985—August 1, 1990 |
| *The Pastures of Heaven* | October 21, 1932 | October 21, 1978 | October 20, 1991 | October 21, 1988-October 20, 1993 |
| *The Red Pony* | September 24, 1937 | September 24, 1983 | September 23, 1996 | September 24, 1993—September 23, 1998 |
| "The Gift" | October 18, 1933 | October 18, 1979 | October 17, 1992 | October 18, 1989—October 17, 1994 |
| "The Great Mountains" | November 16, 1933 | November 16, 1979 | November 15, 1992 | November 16, 1989—November 15, 1994 |
| "The Promise" | July 20, 1937 | July 20, 1983 | July 19, 1996 | July 20, 1993—July 19, 1998 |
| *To A God Unknown* | September 15, 1933 | September 15, 1979 | September 14, 1992 | September 15, 1989—September 14, 1994 |
| *Tortilla Flat* | May 28, 1935 | May 28, 1981 | May 27, 1994 | May 28, 1991—May 27, 1996 |
| *In Dubious Battle* | January 28, 1936 | January 28, 1982 | January 27, 1995 | January 28, 1992—January 27, 1997 |
| *Of Mice and Men* | February 26, 1937 | February 26, 1983 | February 25, 1996 | February 26, 1993—February 25, 1998 |
| *Of Mice and Men* (Play) | December 10, 1937 | December 10, 1983 | December 9, 1996 | December 10, 1993—December 9, 1998 |
| *The Long Valley* | September 16, 1938 | September 16, 1984 | September 15, 1997 | September 16, 1994—September 15, 1999 |
| *The Grapes of Wrath* | April 16, 1939 | April 16, 1985 | April 15, 1998 | April 16, 1995—April 15, 2000 |

---

[3] Notwithstanding the statute's provision that "notice shall be served not less than two nor more than ten years before" the effective date of termination, 17 U.S.C. § 304(c)(4)(A), the earliest date any valid termination notice could have been served under section 304(c) was January 1, 1978, the effective date of the 1976 Act.  *See Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 491 F. Supp. 1320, 1325 (S.D.N.Y. 1980).

Thus, as shown above, when Elaine Steinbeck and Penguin executed a new publishing agreement on October 24, 1994 (the "1994 Agreement"), each and every transfer of rights under the 1938 Agreement had been subject to statutory termination, with the reverted rights vesting in the termination owners immediately upon service of the termination notice, for anywhere from nine years to the full statutory window of 13 years.  During such times Elaine, Thom and Blake, the owners of the statutory termination interests, 17 U.S.C. § 304(c)(2), possessed the unencumbered freedom to serve notices terminating John Steinbeck's pre-1978 grants under the 1938 Agreement, effective on dates of their choosing within the five-year windows noted above.  They did not avail themselves of this protracted "opportunity to reclaim the extended term," House Report at 140, 141, under the statute.

However, Elaine Steinbeck chose another option Congress made available to her as sole owner of all of the renewal copyrights in the Works.  Far into the period when termination notices could have been served, terminating each of the grants under the 1938 Agreement—and as to some Works, after the period for serving a statutory notice of termination had passed entirely—Elaine mutually agreed with Penguin to *contractually* terminate the 1938 Agreement and enter into a new one in its place.

### E.    The 1994 Agreement

The 1994 Agreement, like the 1938 Agreement, is governed by New York law.  Ex. B ¶ 11A.  The 1994 Agreement "cancel[s] and supersede[s] the previous agreements, as amended, for the Works … covered hereunder," Ex. B ¶ 19, and recites that the parties, Elaine Steinbeck and Viking Penguin, "for an additional consideration … have agreed to enter into a new agreement for continued publication of" the Works.  In the 1994 Agreement Elaine "grants and assigns to the Publisher, for the remaining term of copyright, and such renewals or extensions

8

thereof as may now or hereafter exist," publication rights in the Works.  Ex. B ¶ 1.  The

"additional consideration" was very substantial, including, notably and without limitation:

- In place of the vagaries of customary royalty earnings, a provision for annual guarantees, that total $435,500 in the first year of the agreement, declining to $335,000 for the seventh and subsequent years, with the annual guarantee in such subsequent years adjusted upward based on increases in the National Consumer Price Index.  Ex. B ¶ 7.

- The guarantees (i.e., payable even if not earned) contrast sharply with the meager advances in the 1938 Agreement ($250 on delivery of each book manuscript and $250 on its publication).  Ex. B ¶ 4(f).

- An out-of-print termination clause providing that if any one of the 19 titles covered by the 1994 Agreement, *as well as* the 18 titles covered by Penguin's "separate agreement with Elaine Steinbeck and Thomas Steinbeck dated October 24, 1994," Ex. C,[4] goes out of print, Penguin's rights in *all* of the works covered by *both* agreements will revert to the grantor.  Ex. B ¶ 8A.  This ensured that Penguin would continue to exploit *all* of the Works (not just the most popular ones) and thus maximize the opportunity for sales and royalties.

- Generally, higher royalties on the rights granted.

- Elaine's right of approval over virtually all subsidiary rights licenses, Ex. B ¶ 11, thus maximizing her control over their exploitation.

---

[4] This companion agreement reflects Thom's renewal copyright ownership of 18 works by John Steinbeck, including *Cannery Row*, *The Pearl* and *East of Eden* (the first selection for the relaunched Oprah's Book Club in 2003).  *See* Ex. C.

These provisions, and the other additional benefits attained by the copyright owner under the 1994 Agreement, reflected the increased value of the Works in the 56 years of commercial exploitation since the 1938 Agreement.  In the ten years since its execution the validity of the 1994 Agreement has never been challenged or questioned.

**F.     Thom and Blake's Notice of Termination Under the Sonny Bono Act**

In 1998 (four years after the 1994 Agreement) the Sonny Bono Copyright Term Extension Act (hereinafter "CTEA") extended by 20 years the 75-year duration of subsisting pre-1978 copyrights.  The CTEA amendments included a new termination provision, section 304(d). Section 304(d) applies to copyrights in their renewal term on the effective date of the CTEA (October 27, 1998), for which the termination right under section 304(c) had expired by that date, and as to which the author or the owner of the section 304(c) termination right has not previously exercised the right.  Section 304(d) gives such authors or their statutorily designated heirs an opportunity to terminate pre-1978 grants during a five-year period beginning 75 years after the subject copyrights came into existence.  17 U.S.C. § 304(d); *see Goldstein* § 4.11, at 4:213-14.

Elaine Steinbeck died on April 27, 2003.  On June 8, 2004 Thom and Blake served on Penguin a Notice of Termination (Ex. F) purporting to terminate the grants under the 1938 Agreement pursuant to the new copyright termination provision, 17 U.S.C. § 304(d).  The Termination Notice states that termination is to be effective on various specified dates beginning as soon as July 1, 2006 and running through April 15, 2014.[5]

---

[5] The Notice of Termination is also directed to the Estate of Elaine Steinbeck, and is the subject of a separate motion regarding its validity in the action Thom and Blake have brought against McIntosh & Otis, Inc., the Estate of Elaine Steinbeck, *et al.*, filed in this Court (No. 04-CV-5497) on July 15, 2004, just 15 months after Elaine's death, but 10 years after she made the 1994 Agreement.

10

## II.   NEITHER THE CONTRACTUALLY TERMINATED 1938 AGREEMENT NOR THE 1994 AGREEMENT IS SUBJECT TO TERMINATION UNDER SECTION 304(D)

The Copyright Act; the legislative history, showing Congress's intent in enacting the termination provisions of the 1976 Act; and New York contract law all vindicate the right of an author or author's heir to terminate by contract an existing grant and make a new grant of the rights covered by the revoked agreement.

In 1994, the 1938 Agreement was contractually terminated, and a new grant of rights was made to Penguin by Elaine Steinbeck, John Steinbeck's widow and successor, the sole owner of the extended renewal terms in the Works.  The 1994 Agreement fully accomplished the legislative purpose behind the 1909 Act's reversion scheme, carried over into the termination provisions of the 1976 Act; i.e., giving the author or the author's successor the chance to revoke a grant of rights, and to make a new grant of rights for better consideration.

Further, as Congress anticipated, the contractual revocation and new grant of rights took place when the market value of the Works could be fully appreciated, due to 50-plus years of their commercial exploitation.[6]  And the contractual revocation of the 50-plus-year-old grants of rights in the Works was effected at a time when the owners of the termination rights had possessed, for a decade and more, the right to serve notices of termination under section 304(c) of the Copyright Act.

---

[6] The 56 years between the 1938 Agreement and the 1994 Agreement is double the 28-year initial copyright term under the 1909 Act, which Congress deemed sufficient time for authors to learn the "true monetary value of their works," *Woods v. Bourne Co.*, 60 F.3d at 982; *cf.* 17 U.S.C. § 203, which embodies the legislature's assumption that 25 years is sufficient for the market value of transferred rights to be known.  Defendants thus display considerable audacity (as well as mendacity) in arguing that they should be accorded the "absolute right" to terminate any and all pre-1978 grants so that "statutory heirs like Thom and Blake are not stuck with grants given long before a copyright's true value is known."  Def. Mem. 1.

11

A.    **The 1938 Agreement Cannot Be Terminated Because It Was Validly Terminated By Contract In 1994**

The grants under the 1994 Agreement are not subject to termination.  Section 203 is the only termination provision that could apply to such post-1978 grants.  However, section 203 applies only to grants "executed by the author on or after January 1, 1978," and not to grants made by successors or heirs such as Elaine Steinbeck.  17 U.S.C. § 203(a).

And like section 304(c), which provided an opportunity for termination during the 19-year extended renewal term, section 304(d) provides a termination right only as to grants "executed before January 1, 1978."  The termination notice served by Thom and Blake pursuant to section 304(d) purports to terminate "grants made to [Penguin] before January 1, 1978 in the [Works]."  There are no such grants to terminate, however; since the 1938 Agreement was mutually revoked ten years ago by the 1994 Agreement, there has been no pre-1978 grant to which a termination right under section 304(d) might apply.

Thus the 1994 Agreement and the new grant of rights thereunder are not subject to termination under either section 304 or section 203 of the 1976 Act.  As Professor Goldstein states,

> [N]either termination provision would affect the many copyright transfers that were executed after January 1, 1978 by someone other than the author. … Although it could be argued that Congress did not intend this gap in the termination right's coverage, the legislative history indicates that the drafters did intend section 203 to exclude from the operation of that section transfers made by an author's family members and, further, acted deliberately in choosing a cut-off date for section 304(c).

*Goldstein* § 4.10 at 4:189-90.  Thom and Blake cannot and do not dispute that if the termination of prior grants in the 1994 Agreement is effective there are no pre-1978 transfers for them to terminate.  They therefore take on the 1994 Agreement itself, asserting, ten years after it took effect, that the 1994 Agreement is invalid for three reasons.  They argue:

12

1.  That the 1994 Agreement, despite its undisputed validity under New York law, cannot have canceled and superseded the 1938 Agreement because it did not afford "Steinbeck's statutory heirs" a "moment of freedom."  Def. Mem. 2-3.

2.  That the 1994 Agreement is an "agreement to the contrary."

3.  That the 1994 Agreement itself, by its "plain" or "express" language, accords to Thom and Blake a statutory right of termination under section 304(d).

Each of these contentions is without merit.  Notwithstanding their assertion that "Penguin's position is contrary to black-letter copyright law and the express language of the 1994 Agreement," Def. Mem. 1, Thom and Blake cite not a single "letter" of copyright law, "black" or otherwise, in support of the insupportable notion that the 1994 Agreement is invalid because it did not afford them a "moment of freedom," or that it is an "agreement to the contrary" under section 304(c)(5).  Moreover, the "express language of the 1994 Agreement" cited by Thom and Blake simply does not say what they say it does.  It would not help them even if it did, for a private contract such as the 1994 Agreement could not create a statutory right of termination where there is none.

### B.    The Legislative History Shows That Congress Anticipated and Approved Agreements Such As the 1994 Agreement

The 1976 Act was the product of "what must surely be the longest sustained copyright reform effort on record," Frank R. Curtis, *Protecting Authors in Copyright Transfers:  Revision Bill § 203 and the Alternatives*, 72 Colum. L. Rev. 799, 799 (1972) (hereinafter "Curtis, *Protecting Authors*"), and the extensive and detailed legislative history has been judicially accorded special status in interpreting the meaning of the 1976 Act.  *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 743 (1989); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 289-90 (2d Cir. 2002); *see also Nat'l R.R. Passenger Corp. v. Nat'l Assoc. of R.R.*

13

*Passengers*, 414 U.S. 453, 458 (1974) ("even the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent.").  And "[i]n surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation."  *Eldred v. Ashcroft*, 537 U.S. 186, 210 n.16 (2003) (internal quotations omitted); *Garcia v. United States*, 469 U.S. 70, 76 (1984).  Professor Nimmer characterized the 1976 House Report as "the most important piece of legislative history concerning the [1976] Act." Melville B. Nimmer, *Termination of Transfers Under the Copyright Act of* 1976, 125 U. Pa. L. Rev. 947, 950 (1977).

The legislative history of the 1976 Act is for the most part equally applicable to both section 203 and section 304.  *Harry Fox Agency, Inc. v. Mills Music, Inc.*, 543 F. Supp. 844, 855 (S.D.N.Y. 1982) ("The legislative history indicates that the two termination provisions … are intended to be applied in substantially the same way.  However, the legislative history of section 203 is considerably more extensive than that of the other section; for example, in some instances the legislative history of section 304(c) simply refers to section 203.  Thus, the Court has considered the legislative history of both sections, although always in light of the differences between the two.").

The legislative history establishes that the termination provisions were intended as anything but the sweeping abrogation of freedom of contract Thom and Blake claim them to be, particularly with respect to voluntary contractual terminations.  In fact, Congress explicitly stated its intent to preserve authors' freedom to terminate transfers contractually.  Both the House and the Senate promulgated the following language:

> nothing in this section or legislation is intended to change the existing state of
> the law of contracts concerning the circumstances in which an author may
> cancel or terminate a license, transfer, or assignment.

House Report at 128, 142; Senate Report at 111, 125.  Moreover,

> Nothing contained in this section or elsewhere in this legislation is intended to
> extend the duration of any license, transfer or assignment made for a period of
> less than thirty-five years.  If, for example, an agreement provides an earlier
> termination date or lesser duration, or if it allows the author the right of
> canceling or terminating the agreement under certain circumstances, the
> duration is governed by the agreement.

House Report at 142; Senate Report at 125.[7]

And in discussing termination of rights under section 203 (for post-1978 grants by an

author), both houses of Congress stated in identical language their specific intent that that

provision "would not prevent the parties to a transfer or license from *voluntarily agreeing at any*

*time* to terminate an existing grant and negotiating a new one, thereby causing another 35-year

period to start running."  House Report at 127; Senate Report at 111 (emphasis added); *accord*

House Comm. on Judiciary, 89th Cong., Supplementary Report of the Register of Copyrights on

the General Revision of the U.S. Copyright Law 76 (Comm. Print 1965) (hereinafter "Register's

Supplementary Report").  This language is equally applicable to section 304(c) because

"subsection (c) of Section 304 is a close but not exact counterpart of § 203."  House Report at

140; *see Goldstein* § 4.11.1, at 214-15 ("apart from these points of divergence, the rules

described in the discussion of section 203 above apply to section 304(c)").[8]

---

[7] Identical language appears in the House Judiciary Committee's discussion of termination
under section 203, setting forth the termination right with respect to post-1978 grants.  House
Report at 128.

[8] The legislative history of sections 203 and 304(c) indicates that Congress intended both
sections to serve the same purposes and have the same consequences, with limited, specified
exceptions.  *See also Nimmer* § 11.02[c][3] at 11-35 (when Congress "incorporated the identical
language into Section 304(c) without hinting at a disparate treatment, its silence most likely

*(footnote continued on following  page)*

Through the statutory termination right Congress intended to afford an author or a "statutory beneficiary who has signed a disadvantageous grant … the *opportunity* to reclaim the extended term."  House Report at 140, 141 (emphasis added); *see* Register's Supplementary Report 95 ("Section 304(c) closely parallels section 203 by providing an opportunity to terminate … under the same conditions and with the same limitations provided in the earlier section.").  Thom and Blake acknowledge on the one hand that the termination right's purpose is to afford to those authors and heirs who are entitled to it an "opportunity," under specific circumstances, to terminate transfers.  *E.g.*, Def. Mem. 9-10 (quoting House Report 140 ("strong reasons for giving the author … an opportunity to share in the benefits …")).  Elsewhere, however, Thom and Blake argue in effect that Congress intended not an opportunity but a certainty—that termination is an "absolute right" that is "completely inalienable," Def. Mem. 9, 6, and even inevitable, to the point that any state of affairs, or any action taken or not taken, by anyone at any time, that results in their not having a termination right must be retrospectively invalidated.

In the protracted legislative effort that led to the 1976 Act, automatic termination was in fact among the options considered and rejected.  House Report at 124.  But an automatic, inevitable, immutable termination right is simply not the intent or the effect of the statutory termination provisions Congress actually enacted.

The legislative history quoted above shows clearly that Congress meant to prevent authors from agreeing in advance not to exercise their statutory termination rights, as had commonly occurred with respect to the advance assignment of renewal rights under the 1909

---

*(footnote continued from previous  page)*
connotes that it envisioned the same consequences accruing there as well.").  Thus, Congress expressly limited its discussion of section 304(c) to "the most important distinctions between the termination rights under the two sections."  House Report at 141.

Act.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) ("the clear

Congressional purpose behind § 304(c) was to prevent authors from waiving their termination

right by contract.").  It shows equally clearly that Congress intended to preserve authors' and

termination owners' freedom of contract in other respects; particularly their freedom to

contractually terminate old grants and create new grants on more beneficial terms.  Logic

dictates, and Congress clearly contemplated, that "the statutory purpose of giving the grantor at

least one chance to revoke the grant," Melville B. Nimmer & David Nimmer, *Nimmer on

Copyright* § 11.07 (2001) (hereinafter "*Nimmer*"), may be accomplished equally well through a

consensual contractual termination as through formal utilization of section 304(c)'s optional

termination mechanism.

### C.   Termination Rights Are a Limited Exception To Freedom of Contract, Not a Sweeping Abrogation

The statutory termination right Congress actually created is far from being the

preordained moral birthright of authors' descendants that Thom and Blake describe.  It is instead

"a limited exception to the general principle embodied in the Copyright Act that copyrights are

fully assignable by contract," S. Rep. No. 104-315, at 17 (1996).  The Copyright Act,

accordingly, does not mandate a termination right in all circumstances.  Nor does it purport to

guarantee each generation a termination right.  *See* 2 Howard B. Abrams, *The Law of Copyright*

§ 12.01[A] (2002) ("termination is not an unlimited cornucopia.").

Congress created numerous and significant exceptions to termination rights.  The

termination right under section 203 excepts pre-1978 transfers; section 304 excludes post-1978

transfers.  An important limitation is found in section 304(c)(1), which requires a majority of the

persons who own a deceased author's termination right in order to terminate a grant executed by

the author.  In so structuring the rule Congress necessarily intended that some such persons

17

would possess an inalienable termination right, yet be unable to exercise it because of a deadlock or tie.  (No such majority-rule applies to joint authors, however.  *See Nimmer* § 11.03.)

Section 304(c) makes the termination device inapplicable to an author's grant made "by will," as well as to the entire class of "works made for hire."  17 U.S.C. §§ 304(c), 101 (definition of "work made for hire").  Section 304(c)(6)(A) provides that a "derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination."  Section 304(c)(6)(D) provides that statutory termination "affects only those rights … that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws."

Section 304(d) by its terms excludes works for which the termination right under section 304(c) had not expired by October 27, 1998, the effective date of the Sonny Bono Act.  And section 304(d)'s limitation to grants as to which "the author or owner of the termination right has not previously exercised such termination right" necessarily precludes numerous children and grandchildren from eligibility for termination rights they might otherwise have inherited.

Thom and Blake appear to suggest that unless their interpretation of the reach of section 304(d) termination is sustained, they will have been excluded from the benefit of John Steinbeck's copyrights.  That is not correct.  They are renewal copyright owners of at least 18 works, including *East of Eden*, *The Pearl* and *Cannery Row*—and Thom is a party to the October 1994 Agreement for those works, *see* Ex. C, made with Penguin at the same time as Elaine Steinbeck's 1994 Agreement with Penguin for the copyrights she inherited from her husband, *see* Ex. B.

This is not a case concerning a grant of renewal copyrights "by will," an express exclusion from section 304(c) and (d) termination rights.  17 U.S.C. § 304(c) and (d).  Those

18

termination rights do not apply to transfers "by will"; *see* Register's Supplementary Report at 76 ("The right of termination would apply only to *inter vivos* transfers or licenses granted by the author.  We believe that the reasons behind the reversion provision do not apply to the author's bequests …").  But the underlying policy of immunizing testamentary transfers from statutory termination is arguably present here.  John Steinbeck renewed the copyrights in the Works in his lifetime, and in his will (Ex. 1 to Declaration of Thomas Steinbeck) bequeathed those copyrights (and others) to his wife Elaine.  (Had she predeceased the author's sons Thom and John IV, they would have been the alternative beneficiaries.)  The author's wishes were clearly stated in his will—he chose to leave his copyrights to his wife.  The boundless scope of termination claimed by Thom and Blake would have the effect, indirectly, of nullifying the transfer of copyrights under John Steinbeck's will—a result that could not have been accomplished directly.

### III.   THE 1994 AGREEMENT IS A VALID TERMINATION AND NOVATION UNDER THE RELEVANT LAW, NEW YORK LAW, WHICH DOES NOT REQUIRE THAT A "MOMENT OF FREEDOM" BE INTERPOSED

Thom and Blake do not dispute that by its express terms the 1994 Agreement canceled and superseded the 1938 Agreement; that Elaine Steinbeck as sole owner of the renewal copyrights in the Works had the unfettered right under the Copyright Act and New York law to effect, with Penguin, the mutual cancellation of the 1938 Agreement; that Elaine Steinbeck as copyright owner had an equally unfettered right under applicable law to make a new agreement assigning rights in the Works; and that by doing so, on more favorable terms than she received under the prior agreement, Elaine did precisely what Congress sought to afford authors and their heirs the "opportunity" to do through statutory termination.

Instead Thom and Blake argue that the 1994 Agreement "did not genuinely 'cancel' the 1938 agreement *as a matter of federal copyright law* because it never discharged that old

19

agreement in a way that left Steinbeck's statutory heirs a 'moment of freedom' from Penguin." Def. Mem. 2-3 (emphasis added). Thom and Blake's "moment of freedom" argument rests on the slenderest of reeds, and one found nowhere in federal copyright law: a conjecture in a copyright *treatise*, derived by analogy from an *argument* in a contracts treatise, which argument is concededly contrary to New York law, and has been abandoned in the current version of that same contracts treatise.

The "moment of freedom" argument rests entirely on a brief passage in the *Nimmer* treatise that found fault with a simultaneous termination and new grant of copyright rights under certain circumstances. *Nimmer* compared such an a agreement to a hypothetical scenario in which

> A's only duty to B is to pay him the sum of $5,000. B's duty in return is to perform certain described services for a period of six months. Thereafter A and B enter into a new contract that purports to rescind the prior agreement, and to provide that A's duty will remain the same—the payment of $5,000— but B's duty will be altered in that the same services will be required of him for one year rather than six months. The pre-existing-duty rule invalidates the second agreement.

*Nimmer* § 11.07 at 11-42. Citing only lA Arthur L. Corbin, *Contracts*, § 186 (1963), *Nimmer* asserts that, notwithstanding A's and B's manifest intention to end their first contract, their second contract is unenforceable as a matter of law. *Nimmer* then conjectures that, by analogy to the "pre-existing duty rule," a contractual termination and simultaneous new grant of copyright rights "may" also be viewed as unenforceable if it were seen as "subvert[ing] the statutory rule" that, once notice of a *statutory* termination has been served, new grants, or agreements to make new grants, of the terminated rights are valid only if made after the actual termination date. *Id.*; *see* 17 U.S.C. §§ 203 (b)(4), 304(c)(6)(D).

20

Each of those provisions contains a crucial "exception," explicitly *permitting* agreements for such further grants between the author or heirs "and the original grantee or such grantee's successor in title" to be made immediately after service of a statutory termination notice, and before termination becomes effective.  17 U.S.C. §§ 203(b)(4), 304(c)(6)(D).  In the words of a noted commentator, "[t]he preferred position enjoyed by the original grantee after the notice has been served was described by the House Committee as 'in the nature of a right of first refusal.'" Frank R. Curtis, *Caveat Emptor in Copyright: A Practical Guide to the Termination-of-Transfers Provisions of the New Copyright Code*, 25 Bull. Copyright Soc'y U.S.A. 19, 68 (1977) (hereinafter "Curtis, *Caveat Emptor*"), citing House Report at 127.  "In fact, when [the termination provisions are] read in light of the Congressional Reports, there does not appear to be any real restriction at all upon new grants to the original grantee."  *Id*. at 68-69.[9]  Sections 203(b)(4) and 304(c)(6)(D), by allowing authors and their heirs to enter binding contracts with original grantees after a termination notice is served, but before its effective date, actually show that no "gap" or moment of freedom is required between the termination of a grant and the creation of a new grant in its place.

And the contracts rule from which *Nimmer* surmises that the "moment of freedom" requirement "might" be found "by analogy" is not a rule at all.  It is true that the *Corbin* treatise *argues* that the second hypothetical contract between A and B ought to be unenforceable for want

---

[9] "The avowed purpose of this provision [§ 304(c)(6)(D)] is 'to avoid trafficking in future interests by third parties, which would deprive the original grantee of the opportunity to negotiate a further transfer ....'"  Curtis, *Protecting Authors* at 826 (citing Register's Supplementary Report 76); *cf*. H.R. Rep. No. 90-83 at 94-95 (1967).  *Nimmer*'s theory does not account for the favored position accorded by the statute to original grantees and their successors.

21

of consideration from B to A according to the "pre-existing duty rule."[10]  As the *Corbin* treatise stipulates, however, this application of the "pre-existing duty rule" is not the law in New York.

In fact, since at least as far back as *Schwartzreich v. Bauman-Basch, Inc.*, 231 N.Y. 196 (1921), it has been black-letter New York law that contracts such as *Corbin*'s hypothetical agreement are enforceable.  The New York Court of Appeals enforced just such a contract in *Schwartzreich*, stating:

> There is no reason that we can see why the parties to a contract may not come together and agree to cancel and rescind an existing contract, making a new one in its place.  We are also of the opinion that reason and authority support the conclusion that both transactions can take place at the same time.

*Id*. at 205; *see Green v. Doniger*, 300 N.Y. 238 (1949) ("an abandonment of a contract not under seal by mutual consent has always been considered effective to discharge its obligations …, even when a new contract containing one or more of the same terms is simultaneously entered into."); *Jones v. Trice*, 202 A.D.2d 394, 608 N.Y.S.2d 688 (2d Dep't 1994) ("It is well settled that the parties to an agreement can mutually agree to terminate it by expressly assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter.").

The Restatement (Second) of Contracts comment that Thom and Blake unaccountably cite in support of their "moment of freedom" theory is in complete agreement; in fact, one of its Illustrations recites the facts of *Schwartzreich*, *supra*:

> A is employed by B as a designer of coats at $90 a week for a year beginning November 1 under a written contract executed September 1.  A is offered $115 a week by another employer and so informs B.  A and B then agree that A will be paid $100 a week and in October execute a new written contract to that effect, simultaneously tearing up the prior contract.  *The new contract is binding.*

---

[10] Here there is no question that the 1994 Agreement is supported by far more than sufficient consideration—although there is no requirement for such consideration under New York law.

Restatement (Second) of Contracts § 89, cmt. b, Illustration 3 (emphasis added).

Even the *Corbin* treatise, *Nimmer*'s sole authority, in its current version recognizes that "[i]f the new agreement that is simultaneous with the rescission contains [as here] new duties on both sides, there is no doubt as to its enforceability." 2 Joseph M. Perillo & Helen H. Bender, *Corbin on Contracts* § 7.15, at 412 (Rev. ed. 1995 and 2002 Supp.). In short, it cannot be disputed that as a matter of contract law, the 1994 Agreement revoked the 1938 Agreement and created a new and different agreement in its place.[11]

Thom and Blake claim that *De La Hoya v. Top Rank, Inc.*, 2001 U.S. Dist. LEXIS 25816 (C.D. Cal. Feb. 6, 2001), "reached th[e] same conclusion" that *Corbin* argued. Def. Mem. 17. It did not, and moreover is of no conceivable relevance to statutory termination under section 304(c). *De La Hoya* concerned not contract law (and certainly not the Copyright Act) but a state labor statute—California's "Seven Year Rule," Cal. Labor Code § 2855(a), which provides that "a contract to render personal service ... may not be enforced against the employee beyond seven

---

[11] Thom and Blake state that they "can envision parties entering into numerous types of post-1978 agreements for which this 'moment of freedom' may be found." Def. Mem. 17 n.12. The two they specify are (a) agreements as to works that "never were the subject of any prior agreement"—*i.e.*, where there has never *been* an agreement from which there could be a "moment of freedom"; and (b) agreements as to works previously subject to agreements, which have expired. They do not include the "moment of freedom" scenario as *Nimmer* propounded it: i.e., the parties to a pre-1978 grant mutually terminate the grant, wait a "moment" ("a minute portion or point of time : instant"; "a comparatively brief period of time," Merriam Webster's Collegiate Dictionary (10th Ed. 1997)), and then enter into a new grant for new consideration. Assuming "moment" is used with its normal meaning—and *Nimmer* does not suggest otherwise—the empty formalism of the "moment of freedom" is apparent. Thom and Blake do not explain how they, or Elaine (the owner of half of the termination interest in the Works, whose need for a "moment of freedom" they sometimes allege), or for that matter the purposes of copyright, would be better served if in 1994 Elaine and Penguin had mutually terminated the 1938 Agreement, taken a coffee break, and then entered into a separate agreement granting rights in the Works for new consideration. That is, Thom and Blake do not even feign to care for their "moment of freedom" theory except as a means of attacking the 1994 Agreement.

23

years from the commencement of service under it." The Court found that under the plain meaning of the state statute, and a line of cases going back to *De Haviland v. Warner Bros. Pictures*, 67 Cal.App.2d 225, 153 P.2d 983 (1944), a series of management agreements that amounted to "a continuous, uninterrupted eight-year contractual relationship" violated the statute. The court stated that neither a new agreement entered into while the first agreement remained effective nor a "mid-term amendment" that did not "provid[e] for a period of freedom" would reset the clock for purposes of the seven-year time limit. 2001 U.S. Dist. LEXIS 25816, *38. In *De La Hoya* a "period of freedom" was required to comply with the California labor statute—a remedial statute that under California law is to be "liberally construed to promote the general object sought to be accomplished." *Id*. at *34 n.9.

The Court, moreover, found that its ruling was in accord with the legislative history of the statute, which showed that the California Legislature had repeatedly considered and declined to enact amendments to section 2855 "to permit new or superseding contracts to restart the seven-year period." *Id*. at *38-39. Nothing in *De La Hoya*, save its deference to legislative history, is of relevance to any issue here.

The situation here is unlike the one for which *Nimmer* made its tentative proposal. Prior to its speculations on the "moment of freedom" the *Nimmer* treatise propounds a hypothetical scenario that Thom and Blake characterize as "eerily reminiscent of the facts of this case," Def. Mem. 19: a mutual termination of a pre-1978 publishing agreement, and simultaneous entering into of a new contract, between an author's widow and sole heir and the original grantee. *Nimmer* unambiguously affirms that such a mutual contractual termination leaves no pre-1978 grant to be terminated under section 304:

24

> "If ... prior to the time for such statutory termination the widow (on behalf of the estate) and the publisher were to agree to mutually rescind the old publication contract, and substitute a new contract under which the widow would again be the exclusive recipient of royalties, *this would effectively preclude the children from terminating the original grant since it would have been previously terminated by mutual rescission.*  The children, then, could not participate in any benefits from any newly executed grant.  The widow would thus have reason to enter into such a voluntary termination even if the consideration she were to receive under the new contract were no greater than that she received under the original contract.

*Nimmer* § 11.07 at 11-41 n.7 (emphasis added).  Nevertheless, the situation here differs from *Nimmer*'s scenario in a fundamental sense:  *Nimmer*'s hypothetical widow is "motivated to enter into a voluntary termination *in order to avoid a statutory termination*."  *Id.* (emphasis added).  Here, however, no such unseemly "motivation" to deprive anyone of his or her termination rights appears.

For here, the mutual termination of the 1938 Agreement did *not* occur "prior to the time for statutory termination" as in *Nimmer*'s hypothetical, but rather took place well into the time when Thom and Blake (like Elaine) were free to exercise their termination rights under § 304(c)—and as to some Works, *after the long period to terminate had passed entirely.  See* p.7 *supra*.  No one claims even to have attempted to exercise those rights—except insofar as Thom granted Elaine power of attorney to exercise them on his behalf.  Ex. E.

In contrast to *Nimmer*'s hypothetical, under the 1994 Agreement the consideration Elaine Steinbeck received was *substantially* greater than she had received under the 1938 Agreement.  That enhanced consideration was Elaine's "reason to enter into such a voluntary termination"; she clearly did not do so to "preclude" anyone from terminating the 1938 Agreement.  In October 1994 a minimum of nine years, and for many Works the full 13 years, of the time to serve advance notice of termination under section 304(c) had already gone by.  Elaine Steinbeck cannot

reasonably have been motivated to enter into a voluntary termination in order to preclude statutory terminations for which the statutory period for serving notice had run out.

The "moment of freedom" theory is as far as can be from "black letter copyright law." The "moment of freedom" is not found in or supported by the termination-of-transfer provisions, or any other provision, of the Copyright Act, and finds no support in the legislative history. *See*, *e.g.*, Curtis, *Caveat Emptor* at 19 ("Presumably, the House Committee … intended that the author and the grantee could, in a single document, terminate the old grant and make a new assignment of rights").  The contract theory from which it was analogized is contrary to modern contract law.  Thom and Blake cite no other commentator who has ever adopted, endorsed or echoed *Nimmer*'s "moment of freedom" conjecture.  And not even *Nimmer* proposed that a "moment of freedom" requirement might apply to the situation at hand.

The only court that has considered the "moment of freedom" argument Thom and Blake offer was "unpersuaded," for reasons that are fully applicable here.  *Milne v. Stephen Slesinger, Inc.*, 2003 U.S. Dist. LEXIS 7942 (C.D. Cal. 2003), like the instant case involved grants of rights made in the 1930s by the author.  In 1930 and 1932 A.A. Milne granted certain rights in the "Winnie the Pooh" works to Slesinger.  In 1983 Milne's son Christopher Robin Milne and Slesinger executed a new agreement that revoked the 1930s agreements, and "on the same page," *id*. at *8, re-granted to Slesinger all the rights that A.A. Milne had granted to Slesinger in the 1930s agreements.  Christopher Robin Milne died in 1996.  In 2002 Clare Milne, A.A. Milne's granddaughter, served notices of termination under Section 304(d) purporting to terminate the grants under the 1930s agreements, and sued seeking declaratory judgment that the notices were valid.

26

Clare Milne argued, "point[ing] to the interpretation … set forth in *Nimmer on Copyright*, § 11.07," *id*. at *15, that because Christopher Robin Milne had not had a "moment of freedom" in which he "could refuse to execute the new agreement," the 1983 agreement was an extension of the original 1930 agreement.  *Id*. at *16-17.[12]

The Court was "unpersuaded, for two reasons":

> First, neither § 304(c)(5) nor § 203(a)(5), both of which provide that termination of a grant may be effected "notwithstanding any agreement to the contrary," apply to this case.  Section 304 does not apply, because this is a post-1978 agreement, and § 203 does not apply, because the grant in question was not made by the author.  Second, even if § 304 were deemed applicable, the author's son had the *opportunity* to terminate the 1930 Grant as to each of the four works prior to the execution of the 1983 agreement on April 1, 1983.

*Id*. at 17-18 (emphasis added).  The Court found that since "the termination notices … could have been served before the execution of the 1983 agreement, Christopher Robin Milne … had his 'moment of freedom' to revoke the rights granted to SSI under the 1930 Grant, but chose not to do so."  *Id*. at *18.

Here, as noted above, at the time of the 1994 Agreement the termination interest owners Thom and Blake (and Elaine) were fully able to assess the Works' value, due to more than a half-century of exploitation from 1938 to 1994; and had already had, by the operation of the statute itself, decade-plus "moments" of freedom to revoke each of the grants under the 1938 Agreement, but chose not to.  In such circumstances "the concern raised by *Nimmer* regarding conditioning a revocation of rights on a new grant of those rights is not implicated."  *Id*.

---

[12] Clare Milne's "moment of freedom" argument appears to have stopped short of Thom and Blake's unsustainable argument here; i.e., Clare Milne does not appear to have argued that *she*, the "statutory heir," Def. Mem. 2-3, or anyone but Christopher Robin Milne, the copyright owner, should or could have had a moment of freedom from the 1930 agreement.

27

Until October 1994, there was only a pre-1978 agreement, which Thom and Blake had about 15 years of freedom to terminate under section 304(c), but chose not to do so.  After October 1994, there no longer was any pre-1978 agreement and, instead, only a post-1978 agreement not subject to termination under section 304(c) or (d).

Thom and Blake attempt to distinguish *Milne* from the present case based on the absence here of two allegedly "critical facts" in *Milne*, i.e.:

(1) that the new Milne-Slesinger 1983 agreement "recognized that, as the author's heir, Christopher Robin Milne could have a right of termination under [section] 304(c) of the 1976 Copyright Act ….  By executing the Agreement, however, Christopher Robin Milne agreed not to exercise that right," Def. Mem. 20-21; *Milne*, 2003 U.S. Dist. LEXIS 7942 at *7; and

(2) that "[s]ignificantly, the parties describe their 1983 agreement as a 'new agreement for the future which the parties believe would not be subject to any right of termination under 17 U.S.C. Secs. 203 or 304(c).'"  Def. Mem. 21; 2003 U.S. Dist. LEXIS 7942 at *14.

Those "facts," Thom and Blake argue, differentiate the Milne-Slesinger 1983 agreement from the Steinbeck-Penguin 1994 Agreement, and the present case from *Milne*.  The latter agreement, Thom and Blake claim, "expressly *reserves* Elaine's termination rights," Def. Mem. 21, while in the former Christopher Robin Milne "expressly agreed that this document was … not subject to Section 304 and that he would not, in fact, ever seek to exercise termination rights under that provision," *id*. at 20, thereby "relinquishing them," *id*. at 21.

Thom and Blake assert that because of this "distinction" "the 1994 Agreement, unlike the 1983 agreement at issue in *Milne*, is not a new post-1978 grant and does not extinguish Thom and Blake's termination rights." Def. Mem. 20-21.

Thom and Blake's alleged distinction is inaccurate factually and mistaken legally. The Steinbeck-Penguin 1994 Agreement in fact contains no such "express reservation" of termination rights as Thom and Blake claim. More fundamentally, it would not matter if it did, for termination rights under the federal Copyright Act are determined according to federal statutory law, not the contractual undertakings of private parties. Termination rights under section 304(c) are exclusively the product and province of the statute, subject to "a complex assortment of conditions, time limits and procedural requirements" imposed by the statute. Curtis, *Caveat Emptor* at 74 (quoting Barbara Ringer, "Finding Your Way Around in the New Copyright Law," Publishers Weekly, Dec. 13, 1976). Whether termination rights exist and can be exercised, or not, is determined according to those statutory conditions, time limits and procedural requirements, and private parties' contractual "reservations" and "relinquishments" are all equally ineffective and irrelevant.

Accordingly, neither of the "facts" of *Milne* that Thom and Blake cite—contractual recitations (1) "recognizing" that Christopher Robin Milne "could have" terminated the 1930 Agreement under section 304(c), but in entering a new post-1978 agreement chose not to; and (2) "describing" the new post-1978 agreement as one not subject to termination under either statutory termination provision—is relevant, much less "critical," to *Milne*'s holding; nor do they differ in any meaningful sense from the facts here.

Paragraph 9A of the 1994 Agreement, of which Thom and Blake make much, is equally irrelevant. Thom and Blake's characterization of paragraph 9A is simply incorrect. Its "plain

language," to which Thom and Blake repeatedly allude, plainly shows that it is not an "express reservation" of termination rights, as they claim. Instead its plain purpose is to provide for a double contingency—that Elaine might at some point assert termination rights, and that such an assertion might, for reasons unknown, be successful. Given the substantial ongoing monetary guarantees in the 1994 Agreement, prudence required Penguin to provide for such a possibility, however remote, and to shield itself from a continued obligation to pay for rights that have reverted.

And paragraph 9A also provides that in the event such contingencies occurred, Penguin would have a right of first refusal to recapture the lost rights and thereby retain the agreement intact. Given Penguin's substantial investment in the Steinbeck works for over 50 years, paragraph 9A is the most obvious of belt-and-suspenders provisions.

In any case, a contract provision could not make the law, or change the law, with respect to terminating transfers under the Copyright Act.

***

Although it is clear under state law principles that the 1994 Agreement contractually terminated the 1938 Agreement and created a new post-1978 agreement not subject to statutory termination, Thom and Blake ask the court to revive and reinstate the defunct 1938 Agreement just so they can terminate it again.

## IV.  THE 1994 AGREEMENT IS NOT AN "AGREEMENT TO THE CONTRARY" UNDER THE COPYRIGHT ACT

Thom and Blake argue in addition that the 1994 Agreement is "plainly an unenforceable 'agreement to the contrary' barred by Section 304," Def. Mem. 15, a "*post-hoc* attempt to 'contract around' termination rights," *id*. at 21. Plainly it is not. Thom and Blake's hyperbolic

30

reading of § 304(c)(5)'s provision that termination "may be effected notwithstanding any agreement to the contrary" is unsupported by and indeed contrary to the Copyright Act and applicable state contract law.[13]

The Second Circuit in *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002), found that the meaning and scope of "agreement to the contrary" were not clear from the text of the statute itself. *Id*. at 290 ("we find it necessary to go beyond the mere text and consider the legislative intent and purpose of § 304(c) to ascertain the statute's meaning."). The House Report indicates that the purpose of § 304(c)(5) is to provide that the right to terminate a grant cannot be "waived in advance or contracted away." House Report at 125. And here it is undisputed—indeed, Thom and Blake vociferously insist—that they did not waive or contract away any such right in the 1994 Agreement. Their unequivocal admission closely tracks the House Report's language: "Neither Thom nor Blake were parties to the 1994 Agreement, and they have never contractually transferred their termination rights to Penguin nor agreed to forgo their termination rights." Def. Mem. 6.

That should be the end of it. However, in an attempt to avoid the effect of those undisputed facts, Thom and Blake drum up an exaggerated and indefensible meaning for the statutory text: that "notwithstanding any agreement to the contrary" means that any agreement

---

[13] Thom and Blake are wrong twice when they claim that § 304(c)(5), the "agreement to the contrary" provision in the 1976 Act, shows that "Congress considered this termination right so essential to effectuate the purposes of the copyright laws that Congress made the right inalienable." Def. Mem. 1. The legislative history shows beyond a doubt that section 304(c)(5) was added not because Congress believed such a provision to be essential to effecting copyright's purposes; instead it was intended specifically to preclude the *Fred Fisher* scenario, in which an author is induced to sell or waive reversion rights in advance. *See* House Report 125; *see generally* Leval, *supra*. Under section 304(c)(5) termination rights are "inalienable" in the sense that a termination owner may not contract them away or waive them in advance. *Marvel*, 310 F.3d at 290. No such alienation or waiver occurred here.

31

made or action taken by anyone at any time must be retrospectively voided if its effect is that termination rights under § 304(d) never arise for Thom and Blake. Thus, as Thom and Blake would have it, the 1994 Agreement is an "agreement to the contrary" under § 304(c)(5) simply because it validly ended the 1938 Agreement, changing the facts and leaving no pre-1978 transfers for them to terminate now.

In their effort to force the 1994 Agreement into § 304(c)(5)'s prohibition, Thom and Blake misrepresent the Copyright Act and the 1994 Agreement itself. They describe the latter as "an agreement reached after Thom's and Blake's termination rights were created, by a party with a motive to 'contract around' them for its own benefit." Def. Mem. 24. Their scenario collapses on itself. In 1994 it had indeed been a decade and more—as much as 16 years—since Thom and Blake's termination rights were created; as to several Works their extended opportunity to terminate had come and gone entirely. But the timing of the 1994 Agreement shows the opposite of what Thom and Blake allege. Because it was reached so long "after Thom's and Blake's termination rights were created" the 1994 Agreement clearly was *not* made with a motive to "contract around" those rights. Its purpose was exactly what it purports to be: a new agreement whereby the author's widow and heir fulfilled the legislative purpose behind the termination provisions, availing herself of a second chance to negotiate transfers for new and substantially increased consideration at a time when the commercial value of the Works was known.

The Second Circuit in the *Marvel* case, *supra*, cited by Thom and Blake, is the only court to have examined the meaning and application of the "agreement to the contrary" provision.[14]

---

[14] Neither of the other two cases cited by Thom and Blake applies or involves an interpretation of the "agreement to the contrary" provision of section 304(c). Def. Mem. 23. In *Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774 (2d Cir. 1992), the Court found that an author's testamentary transfer of renewal copyrights was ineffective because the author "did not have any

*(footnote continued on following page)*

Neither the facts nor the reasoning of *Marvel* support their claims.  In *Marvel* the parties were Joseph Simon, the creator of the original *Captain America* comics, and Marvel Characters, Inc., successor to the publisher to which Simon contended he orally assigned his interest in the works in question in 1940.  When the initial 28-year copyright term in the works under the 1909 Act neared its end, Simon sued Marvel's predecessor in state and federal court, claiming renewal rights.

In 1969, the parties entered into a settlement agreement in which Simon stipulated that the works were created as works for hire.  The legal effect of the stipulation, if the works were in fact works for hire, would be to make Marvel the legal "author" of the works, and Simon accordingly would have no termination rights in the works.  *See* 17 U.S.C. § 304(c) (exempting works made for hire from termination).  In 1999, Simon served Marvel with notices of termination under section 304(c), and Marvel sued for declaratory judgment that the termination notices were invalid.

---

*(footnote continued from previous  page)*

'right under' the renewal copyrights remaining at the time he executed his Will."  *Id*. at 777.  The limitation of the termination right under section 304 to transfers "otherwise than by will" was thus, not surprisingly, inapplicable.  Thom and Blake's characterization of *Larry Spier* as a case in which "[t]he Second Circuit … rejected … efforts to contract around termination rights, and … broadly applied the statutory prohibition of Section 304 to invalidate such unlawful contracts," Def. Mem. 22, is misleading.

*Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364 (S.D.N.Y. 1999), held that the executor of the estate of the composer Billy Strayhorn, who left neither widow nor children, was Strayhorn's statutory successor, and as such was entitled to terminate assignments Strayhorn had made to music publishers.  *Music Sales* does not apply, and indeed makes no reference to or mention of, section 304(c)(5).

Thom and Blake are thus plain wrong when they claim that "*Larry Spier* and *Music Sales* … recognized that the settlement agreements or will provision before them could not bar termination because they were 'agreements to the contrary' prohibited by the termination statute."  Def. Mem. 24.

The *Marvel* Court found that the meaning of the phrase "agreement to the contrary" is not clear from the text.  310 F.3d at 290.  The Court, accordingly, looked to the provision's legislative history and found that "Congress included the 'notwithstanding any agreement to the contrary' language in the termination provision precisely to avoid" the result of the *Fred Fisher* decision under the 1909 Act.  *Id*. at 291.  In *Fred Fisher*, the Court stated, the Supreme Court "held that renewal rights were assignable by an author during the initial copyright term, before the renewal right vested," whereupon "publishers began to insist that authors assign both their initial and renewal rights to them in one transfer.  The natural effect of this, of course, was to eliminate the author's renewal right under the 1909 Act."  *Id*. at 284.

The Court found that if agreements that works were made for hire, made long after the creation of the works, were treated as outside the purview of section 304(c)(5), the likely result would be to repeat *Fred Fisher*'s result with respect to termination rights—publishers "would be able to utilize their superior bargaining position to compel authors to agree that a work was created for hire in order to get their works published."  *Id*. at 290-91.  And that result would directly defeat the legislative purpose behind the "agreement to the contrary" provision.  As the Court explained:

> The parties to a grant may not agree that a work shall be deemed one made "for hire" in order to avoid the termination provisions if a "for hire" relationship … does not in fact exist between them.  Such an avoidance device would be contrary to the statutory provision that "termination of the grant may be effected notwithstanding any agreement to the contrary." … It is the relationship that in fact exists between the parties, and not their description of that relationship, that is determinative.

*Id*. at 291, quoting *Nimmer* § 11.02[A][2].  Because Simon had proffered admissible evidence that he did not in fact create the works as works for hire, the District Court's grant of summary judgment to Marvel was erroneous.  The Second Circuit remanded the case to allow a jury to

34

determine whether Simon was the author of the Works—and, therefore, whether he had any termination rights under section 304(c) to exercise—based on the relationship that *in fact* existed between Simon and Marvel. *Id*. at 292.

*Marvel*'s facts and its holding are inapposite here. Here there is no questionable work-for-hire agreement executed by an author under duress to subvert his termination right. Instead, the parties to the 1994 Agreement exercised their unencumbered freedom of contract to effect a bona fide termination of prior agreements, and a new grant of rights, that are both undisputedly valid under applicable contract law. In high contrast to *Marvel*'s retroactive, sham work-for-hire stipulation, which the *Marvel* Court found would thwart "the clear Congressional purpose behind § 304(c)[,] to prevent authors from waiving their termination right by contract," *id*. at 290, the parties to the 1994 Agreement used the mechanism of voluntary contractual termination, valid under state law, expressly endorsed by Congress as an alternative to statutory termination. And they did so to achieve one of the fundamental goals of the termination provisions—a "second bite at the apple" allowing the author's widow and heir to exploit the Works for new and better compensation than had been due to her under the terminated grants.

The work-for-hire stipulation in *Marvel* was entered by the author, Joseph Simon; through it Simon "waived or contracted away" his own termination rights. Here it is undisputed that Thom and Blake, with respect to the Works, are neither the author nor the author's heirs, that "[n]either Thom nor Blake were parties to the 1994 Agreement, and [that] they have never contractually transferred their termination rights to Penguin nor agreed to forgo their termination rights." Def. Mem. 6. As Thom and Blake acknowledge, the 1994 Agreement "does not purport to transfer Elaine's *or anyone else*'s 'termination' rights …. [n]or does it require Elaine *or anyone else* to refrain from exercising such rights." Def. Mem. 4 (emphasis added).

Unlike the work-for-hire stipulation in *Marvel*, in the 1994 Agreement the parties "did not attempt to change or modify the nature of their association with one another, or alter the character of their long-standing author/grantee relationship," *Milne*, 2003 U.S. Dist. LEXIS 7942 at *19.  Instead Elaine Steinbeck and Penguin legally revoked their contractual relationship as grantor and grantee, then reinstated it, as Congress intended they should—and on terms more favorable to the grantor/author/heir, as Congress intended the termination provisions to enable them to do.

Unlike the sham work-for-hire agreement in *Marvel*, the timing, context and content of the 1994 Agreement did not undermine or contradict—but instead clearly served—the substantive purposes of the copyright termination provisions:  namely, to enable an author to recapture his or her rights and make new grants following more than a half-century of exploitation, when the work's value could be fully assessed.  Entirely absent here is anything analogous to the *Marvel* Court's concern that publishers could use their "superior bargaining position" to coerce bogus work-for-hire agreements from authors.  Far from being coerced, the 1994 Agreement was a valid publication contract, made by sophisticated parties assisted by counsel (where "parties are represented by counsel … the need to protect 'ill-advised' authors from publishers or other more sophisticated entities—the policy concern underlying § 304(c)—is no longer present," *Marvel*, 310 F.3d at 292), at a time when the value of the Works was understood and while the termination interest owners possessed their extended period of entitlement to exercise their section 304(c) rights.

*Marvel* refutes Thom and Blake's over-the-top reading of section 304(c)(5), i.e., that termination may be effected notwithstanding any state of facts to the contrary.  The *Marvel* Court found that if in fact the relationship between Simon and Marvel was in truth one of employee for

36

hire, that state of facts would render Simon ineligible to terminate under the statute.  310 F.3d at 292.  The *Marvel* Court did *not* find that such facts would comprise an "agreement to the contrary" that must be reversed or ignored so that Simon may exercise termination rights, as Thom and Blake argue here.  Section 304(c)(5) makes the termination right "inalienable" by contract or waiver; it does not make it inevitable under any and all circumstances.

In Thom and Blake's view it is simply impossible for an author or an author's heir to terminate a pre-1978 grant of rights and make a new agreement on better terms.  If the termination and re-granting of rights are achieved in a single document, as parties to an agreement are expressly permitted to do under New York law, according to Thom and Blake the agreement would nevertheless be invalid because the grantor—and then each termination owner, then living or yet unborn—did not have a "moment of freedom."

But of course, if grantor and grantee had observed Thom and Blake's formality—required by neither the Copyright Act nor contract law—and inserted a "moment of freedom" between the termination and the new grant, by Thom and Blake's lights the transaction would still be invalid, for it would be an "agreement to the contrary" insofar as the changed facts foreclosed their claim to termination rights.

The Congressional purpose behind the termination scheme was to provide authors and their heirs with a second chance to negotiate copyright grants at their full value, which may not have been known at the time rights were first granted, and perhaps was not obtained because of the author's inferior bargaining position.  Thom and Blake's interpretation of § 304(c) would have the perverse effect, directly contrary to the statute's purpose, of driving down the value of such second chances.

If no valid post-1978 grant of rights can be made that is safe from termination, simply because it validly replaced a pre-1978 grant, the termination scheme will have the opposite of its intended effect, minimizing the compensation publishers will offer for grants of rights that will always be vulnerable to termination.

## CONCLUSION

Thom and Blake's reading of the termination provisions violates the letter of the statute, and is contrary to its purpose as set forth in the legislative history.  For the reasons given above, Plaintiff's motion for summary judgment should be granted and Defendants' motion should be denied.

Dated:   New York, New York
            February 18, 2005

                                       Respectfully submitted,


                                       _____s/ Richard Dannay_____
                                       Richard Dannay (RD-9407)
                                       Thomas Kjellberg (TK-0605)
                                       COWAN, LIEBOWITZ & LATMAN, P.C.
                                       1133 Avenue of the Americas
                                       New York, New York 10036-6799
                                       (212) 790-9200
                                       Attorneys for Plaintiff
                                       Penguin Group (USA) Inc.

38