USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/8/06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
THOMAS STEINBECK, an individual; and BLAKE
SMYLE, an individual,
    *Plaintiffs and Counterclaim Defendants,*

NANCY STEINBECK, an individual,
    *Intervenor-Plaintiff,*

    - against -

MCINTOSH & OTIS, INC., a New York corporation;
THE STEINBECK HERITAGE FOUNDATION, a non-
profit New York corporation; EUGENE H. WINICK, an
individual; SAMUEL PINKUS, an individual; JEAN
ANDERSON BOONE, an individual; FRANCIS
ANDERSON ATKINSON, an individual; WAVERLY
SCOTT KAFFAGA, an individual and Executor of the
Estate of Elaine Anderson Steinbeck; DAVID SCOTT
FARBER, an individual; ANDERSON FARBER
RUNKLE, an individual; JEBEL KAFFAGA, an
individual; BAHAR KAFFAGA, an individual; and
STEVEN FRUSHTICK, an individual; and Does 1-10,
    *Defendants and Counterclaim Plaintiffs.*
---------------------------------------------------------------X
PENGUIN GROUP (USA) INC.
    *Plaintiff,*

    - against -

THOMAS STEINBECK and BLAKE SMYLE,
    *Defendants.*
---------------------------------------------------------------X

OPINION & ORDER

04-CV-5497 (RO)

04-CV-6795 (RO)

Appearances
---

Mark S. Lee – Manatt, Phelps & Phillips LLP
Attorneys for Plaintiffs/Defendants Thomas Steinbeck and Blake Smyle

Sanford J. Hausler – Cox Padmore Skolnik & Shakarchy LLP
Attorneys for Intervenor-Plaintiff Nancy Steinbeck

Susan J. Kohlmann, Nancy V. Thornton – Pillsbury Winthrop Shaw Pittman LLP

1

Attorneys for Defendants and Counterclaim Plaintiffs McIntosh & Otis, et al.

Richard Dannay, Thomas Kjellberg – Cowan, Liebowitz & Latman, P.C.
Attorneys for Plaintiff Penguin Group

OWEN, District Judge:

Prior to the copyright law amendments taking effect in 1978, there were but two periods of copyright protection – the original period of 28 years, and a 28-year renewal, for a possible total of 56 years. In 1978, the copyright term was increased by 19 years, to a total of 75 years, and in 1998, 20 more years was added to that, for today a total of 95 years.

Given the said length of copyright protection, early in which young creators often less than advantageously contract for long terms with publishers, etc., and it also being the way of the world that a number of such young composers, artists and authors, from time to time, such as John Steinbeck writing his first book in 1929, cannot predict the high stature they would attain,[1] and the popular prominence of their works in musical and literary consciousness – not to mention the eventual high financial rewards to them and their families their work can command, our copyright laws have come to recognize this, and accordingly, in the statute, provide opportunities for such a creator and/or his or her family to terminate – and recapture – rights previously granted others, allowing creators or their heirs appropriate reward for the artistic gifts to our culture.

There are two such "recapture" opportunities during a copyright's lifetime.[2] The first, Section 304(c) of the Copyright Act, grants creators of pre-1978 works or their statutory heirs,[3] an inchoate but inalienable[4] property right[5] to "terminate" earlier grants of copyrights made before

---

[1] Steinbeck was awarded a Pulitzer Prize and the Nobel Prize for Literature.
[2] A third possible mandatory event of return of the grant – if it can be so phrased – is if the creator dies while the copyright is in its first term. Under that circumstance, the right to future renewal does not follow his contractual or testamentary grant. Instead, the expectancy of the renewal rights automatically vests in statutorily enumerated categories of persons – who are *not* bound by the original disposition – according to the following hierarchy: "[1] the widow, widower, or children of the author, ... [2] the author's executors, if such author, widow, widower, or children are not living, or [3] the author's next of kin, in the absence of a will of the author." 17 U.S.C. § 304(a)(1)(C). See also Stewart v. Abend, 495 U.S. 207, 219-20 (1990). Thus, the additional years of protection provided by Section 304(a) represent a completely "new family property right" in pre-1978 works. Larry Spier, Inc. v. Bourne Co., 953 F.2d 774, 779 (2d Cir. 1992).
[3] See 17 U.S.C. § 304(a)(1)(C), discussed *supra*, and 17 U.S.C. §§ 304(c)(1), (c)(2), discussed *infra*, for the statute's categorical hierarchy of entitlement. See also, Larry Spier, 953 F.2d at 778; Abend, 495 U.S. at 218.
[4] The inalienability of the Section 304(c) right has been recognized by the Supreme Court, the Second Circuit, and this Court on myriad occasions. See Abend, 495 U.S. at 230 ("The 1976 Copyright Act ... provides an inalienable termination right."); Larry Spier, 953 F.2d at 779-80 (Section 304(c) "was drafted so as to leave no doubt about the family's power to recapture the copyright."); Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc., 155 F.3d 17, 24 (2d Cir. 1998) (inalienability is "consistent with the general thrust of § 304, which is designed to protect the interests of

January 1, 1978 and to do so beginning 56 years after the copyright was first secured (i.e., upon expiration of both the original 28-year copyright term and the pre-1978 28-year renewal term). 17 U.S.C. § 304(c). Such termination right is optional – not mandatory or automatic – and can be exercised at any time during a five-year period beginning at the end of the said 56 year period, or on January 1, 1978 (the date of enactment of the statute extending the copyright protection term), whichever is later. 17 U.S.C. § 304(c)(3).[6] See Music Sales Corp. v. Morris, 73 F.Supp.2d 364, 372 (S.D.N.Y. 1999). Should the creator die, the statute transfers the termination to specific successor(s),[7] who, upon recapture thereupon possesses and may re-grant those rights. 17 U.S.C. § 304(c)(1), (c)(6). Termination rights vest on the date a notice of termination is served. 17 U.S.C. § 304(c)(6)(B), (C).[8] Once a prior grant of copyright is terminated, statutory heirs are free to grant these rights to whomever they desire, as such new grants fulfill the purpose of the termination right, which is to provide successors in interest with an opportunity to obtain the fair value of the work by negotiating new terms for previously granted rights once the work's true value has appeared. 3-11 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 11.01 [A].

---

authors and their heirs and to maximize their ability to exploit the value of their [works] during the extended renewal term."); Morris, 73 F.Supp.2d at 372 ("unlike the renewal rights, the termination right is inalienable ... Congress resorted to the extraordinary measure of creating an inalienable right in order to ensure that the author's heirs would be able to terminate any contingent grants of renewal rights made during the author's lifetime."). Termination rights remain inalienable until they are exercised by service of a notice of termination. 17 U.S.C. § 304(c)(6)(B); see also, 17 U.S.C. § 304(c)(6)(D) (providing that "[a] further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination ... [or] after the notice of termination has been served ...").

[5] Because Section 304(a) established a completely new family property right in pre-1978 works, see *supra*, "[t]here are strong reasons for giving the author [and/or his statutory heirs] ... an opportunity to share in" the benefits of continued exploitation of such works by permitted the author or his family to terminate third party grants. See *House Report on the Copyright Act of 1976*, House Report No. 94-1476, p. 140 (1976).

[6] A notice of such termination must be served no more than ten or less than two years before termination is to be exercised. 17 U.S.C. § 304(c)(4)(A). Thus, under Section 304(c), a notice of termination may be served between 46 years and 59 years after the copyright was originally secured – a 13-year "window of opportunity" – with the rights that are to revert vesting in the owners of the termination interest on the date the notice is served. 17 U.S.C. § 304(c)(6)(B).

[7] The deceased author's termination interest is owned, and may be exercised, by the following: (i) the author's widow or widower owns the author's *entire* termination interest; (ii) if the author leaves both a widow or widower *and* children or grandchildren, the widow or widower owns *one-half* of the author's interest, and the remaining half is divided per stirpes among the author's progeny; (iii) in the absence of a surviving widow or widower, the author's surviving children, and surviving children of any dead child of the author, own the author's *entire* termination interest, which is divided among them and exercised on a per stirpes basis; or (iv) in the event that none of the aforementioned heirs are living, the author's executor, administrator, personal representative, or trustee shall own the author's *entire* termination interest. 17 U.S.C. § 304(c)(2).

[8] See Range Road Music, Inc. v. Music Sales Corp., 76 F.Supp.2d 375, 377 (S.D.N.Y. 1999); see also 3-11 NIMMER ON COPYRIGHT § 11.03 [A][3] (stating that the class of recipients of the terminated rights is determined as of the date the termination notice is served).

3

The second such termination right was created in 1998 as part of the Sonny Bono Copyright Term Extension Act (CTEA), which extended the copyright term by an additional twenty years, see 17 U.S.C. §§ 304(a), (b), and also gives creators or their survivors who did not exercise their termination rights the first time (i.e., 56 years after the copyright was first secured, see *supra*) a second opportunity to terminate during the five-year period beginning 75 years after the copyright came into existence. 17 U.S.C. § 304(d).[9]

To protect this right and prevent creators or statutory heirs from contracting away, for whatever reason, this absolute right to "recapture" for the years of extended protection any pre-1978 copyright grant, the statute declares void any contract the effect of which is in contravention of or which negates either of these termination rights. 17 U.S.C. § 304(c)(5).[10] See, e.g., Morris, 73 F.Supp.2d at 372; Larry Spier, Inc. v. Bourne Co., 953 F.2d 774, 778 (2d Cir. 1992).

Pursuant to these provisions in the Copyright Act, in May and June 2004, the then-statutory heirs of John Steinbeck – son Thom and granddaughter Blake – served five "Notices of Termination" on various third parties which purported to terminate pre-1978 grants of copyrights John Steinbeck made to those third parties in accordance with 17 U.S.C. § 304(c) and (d). The parties have filed cross motions for summary judgment as to the validity of these notices, and the above-captioned actions are joined for this purpose only.[11]

Turning to the facts here, when John Steinbeck died in 1968, his third wife, widow Elaine, inherited his copyrights in his early works[12] under the residuary clause in Steinbeck's will.

---

[9] Section 304(d) applies to copyrights in their renewal term on the effective date of the CTEA – October 27, 1998 – for which the termination right under Section 304(c) had expired by that date, and as to which the author or the owner of the Section 304(c) termination right has not previously exercised the right. A notice of termination under Section 304(d) must be served no more than ten and not less than two years before termination is to be exercised – i.e., no earlier than 65 years, and no later than 78 years, after copyright was originally secured.

[10] This statutory prohibition is intended to be broadly applied to invalidate such unlawful contracts and liberally protect termination rights. See Marvel Characters, Inc. v. Simon, 310 F.3d 280 (2d Cir. 2002); Larry Spier, *supra*; Morris, *supra*. Indeed, copyright termination abrogates freedom of contract in two ways: it allows for the invalidation of the original contractual transfer, and it abrogates subsequent attempts to contract around the termination right it creates. 17 U.S.C. § 304(c), (c)(5)

[11] Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To satisfy its burden under Rule 56(c), the movant must show that the record raises no genuine issue of material fact for trial. Brink v. Union Carbide Corp., 41 F.Supp.2d 406, 413-14 (S.D.N.Y. 1999); see also Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 252 (1986).

[12] Steinbeck's "early works" are those whose renewal term of copyright (i.e., after the first 28 years of copyright) became due in the course of his lifetime, and for which he filed renewal registrations. Specifically, Steinbeck renewed: *Cup of Gold* (©1929), *The Pastures of Heaven* (©1932), *To a God Unknown* (©1933), *The Red Pony* (©1937), *Tortilla Flat* (©1935), *In Dubious Battle* (©1936), *Of Mice and Men* (©1937), *Of Mice and Men* (play) (©1937), *Murder at Full*

4

However, with respect to these works, as well as those that entered their renewal period after Steinbeck's death,[13] his two sons from his second marriage – Thomas Steinbeck and John Steinbeck IV – though inheriting no interest in the copyrights under their father's will, nevertheless became possessed of a 50% share of the copyright termination interest in each work pursuant to Section 304(c)(2)(B), quoted *supra*, which states that a deceased author's entire termination interest is to be divided, 50% to his widow and 50% to his children [and grandchildren]. 17 U.S.C. § 304(c)(2)(B). Since, however, to exercise a termination right requires a simple majority of the possessors, this meant here that, Elaine and the children being in disagreement, no termination right could be exercised, as neither side had 51%.[14] John IV died in 1991, leaving only one child, Blake Smyle, who now asserts her statutory right in his stead, as Steinbeck's granddaughter.[15] Elaine died in April 2003, leaving all copyrights to her heirs from a previous marriage – all unrelated to Steinbeck.

But upon Elaine's death in April 2003, Thom and Blake, being in agreement, for the first time together possessed the majority (indeed, the totality) of termination interests needed to exercise their termination right. See 17 U.S.C. § 304(c)(1). In May and June 2004, they served five "Notices of Termination" on various third parties which purported to terminate pre-1978 grants of copyrights John Steinbeck made to those third parties in accordance with 17 U.S.C. § 304(c) and (d). Specifically, the Notices terminated: (1) a 1938 grant of book publishing rights made to the predecessor of Penguin Group (USA) Inc. (hereinafter the "Penguin Notice")[16]; (2) grants of motion

---

*Moon* (©1938), *The Long Valley* (©1938), *The Grapes of Wrath* (©1939), *Forgotten Village* (©1941), and *The Sea of Cortez* (©1941) (collectively, the "Early Works").

[13] These "late works" are: *The Moon is Down* (©1942), *The Moon is Down* (play) (©1942), *Bombs Away* (©1942), *Cannery Row* (©1945), *The Pearl* (©1945), *The Wayward Bus* (©1947), *A Russian Journal* (©1948), *Burning Bright* (©1950), *Log From the Sea of Cortez* (©1951), *East of Eden* (©1952), *Sweet Thursday* (©1954), *The Short Reign of Pippin IV* (©1957), *Once There Was a War* (©1958), *The Winter of Our Discontent* (©1961), and *Travels With Charley* (©1962).

[14] The statute provide that if the author himself has made the assignment, and said author is now dead, termination of the assignment may be effected by the person or persons who own and are entitled to exercise a total of more than one-half of the author's termination interest. 17 U.S.C. § 304(e)(1).

[15] Defendants dispute the assertion that Blake is the granddaughter of John Steinbeck, claiming that there has been no conclusive evidence produced to this effect, and there is no mention of her in John IV's will or in his pleadings in the 1981 action. It is undisputed, however, that John IV's heirs continued to receive his royalties, although the identity of those heirs and the distribution arrangement among them are the subject of a confidential settlement agreement or agreements entered into by Blake, Thom, and John IV's former wife Nancy Steinbeck, the intervenor-plaintiff in this action and the purported residuary beneficiary of John IV's Estate under his will. Nancy apparently seeks to ride on the "coat tails" of Thom and Blake's action against the defendants, claiming that neither Thom nor Blake are likely to protect her interests. As this motion is limited to the validity of the termination notices issued by Thom and Blake, the allegations brought by Nancy are not addressed at this time, and the parties have reserved their rights to do so.

[16] Widow Elaine entered into a new agreement with Penguin in 1994, Penguin's right of publication remaining the same as in the 1938 grant, but at a higher consideration, and statutory termination rights explicitly continued, as per the agreement. See discussion *infra*.

5

picture rights in Steinbeck's *The Red Pony* made to Paramount Pictures, Inc. in 1946, 1947 and 1949; (3) grants of motion picture rights to Steinbeck's *The Long Valley* given to Paramount Pictures, Inc. in 1946, 1947 and 1949; (4) a 1956 grant of theatrical rights to Steinbeck's *Cannery Row* given to Rogers & Hammerstein and MGM; and (5) a 1949 grant of motion picture rights in Steinbeck's *The Wayward Bus* made to Twentieth Century Fox Film Corporation. Each notice is now addressed in turn.

## The Penguin Termination Notice

In a 1938 agreement, author John Steinbeck granted to Penguin's predecessor, The Viking Press, Inc., sole, exclusive, and open-ended publication rights in the collection of stories *The Long Valley*, including all thirteen short stories contained therein. By its terms, the 1938 Agreement "supersede[d] all previous agreements made between The Viking Press, Inc. and John Steinbeck," and also applied to "all the previously published books of John Steinbeck," namely: *Cup of Gold*; *The Pastures of Heaven*; *To A God Unknown*; *Tortilla Flat*; *In Dubious Battle*; *Of Mice and Men*; *Of Mice and Men* (Play); *The Red Pony*, and the three stories included therein.[17] Four additional works by Steinbeck were added to the 1938 Agreement by way of its option clause, including *The Grapes of Wrath*, the latest of the works at issue here, in 1939. This agreement provided for ongoing royalties based on net sales, and was periodically amended. Author Steinbeck renewed the copyrights in each of the ten works in question during his lifetime, and when he died in 1968, he bequeathed the copyrights in these early works to his widow Elaine. In 1994, Elaine entered into a "new agreement for continued publication" with Penguin as "Publisher" for these early works, which granted Penguin no more nor less rights than Penguin already had and was exercising under the original 1938 Agreement, although at increased cost to Penguin.[18]

On or about June 13, 2004, Thom and Blake served on Penguin a Notice of Termination, purporting to terminate Steinbeck's grants under the 1938 Agreement pursuant to Section 304(d). Penguin and the defendants in the *Steinbeck* action contend that said notice is invalid as a matter of law, because widow Elaine's 1994 Agreement, by its express terms, "cancel[s] and supercede[s] the

---

[17] The Viking Press, Inc. Agreement, ¶ 13A (Sept. 12, 1938).
[18] Elaine simultaneously entered into a similar agreement with Penguin for the late works on behalf of herself and Thom (who subsequently ratified the agreement on December 22, 1994), but this second 1994 Agreement is not relevant here, although it raises questions of motive.

6

previous agreements, as amended, for the Works,"[19] which effectively transforms Steinbeck's pre-1978 grant into a "new" grant of copyright, executed *on or after January 1, 1978*, and as such, is not subject to termination under Section 304. 17 U.S.C. § 304(c), (d).

I conclude that this argument fails. The 1938 Agreement was author Steinbeck's exclusive grant of publication rights to Penguin's predecessor of certain of his early works, so they unquestionably were within the terms of the subsequently-enacted termination statute.[20] Elaine's 1994 identical grant to Penguin explicitly carries forward possible future termination under the statute, reading: "If Elaine Steinbeck exercises her right to terminate grants made to Publisher in this agreement (in accordance with Section 304(c) of Title 17 of the U.S. Code) ..." See Penguin USA, Contract For Steinbeck titles, p. 13, ¶ 9A, *Termination Under U.S. Law* (Oct. 24, 1994).[21] The contention that the 1994 Agreement extinguished the very termination right that it expressly acknowledges both exists and flows from the 1930s copyrights necessarily fails. At no point did Penguin lose or gain any rights other than those originally granted to it under the 1938 Agreement.[22] Furthermore, to the extent that the 1994 Agreement would strip Thom and Blake – at the time, owners of one-half of the future termination interest, but on Elaine's death, full owners – of their inalienable termination rights in the pre-1978 grants, it is void as an "agreement to the contrary" pursuant to 17 U.S.C. § 304(c)(5).[23]

---

[19] Penguin USA, Contract For Steinbeck titles, p. 10, ¶ 19, *Termination of Previous Agreements* (Oct. 24, 1994).

[20] Indeed, this grant of publication rights is terminable because it is a "copyright subsisting in either its first or renewal term on January 1, 1978, ... [and is] the exclusive ... grant of a transfer or license of the renewal copyright *or any right under it*, executed before January 1, 1978, by [the living author of such work], otherwise than by will [here, by contract] ..." 17 U.S.C. § 304(c) (emphasis added).

[21] Section 304(d) was enacted four years after the contract was entered into, but remains no less applicable, as it simply expanded the opportunity for authors or their statutory heirs to execute their termination rights.

[22] By its terms, absent a default, the agreement was to continue for as long as the publishers keep the works "in print and for sale." The Viking Press, Inc. Agreement, ¶ 12A, *Termination of this agreement* (Sept. 12, 1938). Elaine did not inherit any interest in the book publishing rights Steinbeck granted to Penguin in 1938, because Steinbeck did not own those rights when he died. Rather, Penguin was the owner of said rights pursuant to the 1938 Agreement, and Steinbeck had only a contractual right to receive monies pursuant to that agreement. Elaine inherited only that contractual revenue scheme – she had no "copyright" interest to convey to Penguin by the 1994 Agreement, and Penguin had no need to enter into an agreement with Elaine to maintain its book publishing right (except, of course, to possibly avoid the exercise of federal termination rights – or a lawsuit).

[23] The 1994 Agreement does not purport to transfer Elaine's or anyone else's termination rights under Section 304, nor does it require Elaine or anyone else to refrain from exercising such rights, as any such contractual language that purports to affect inalienable termination interest would run afoul of black-letter copyright law. Rather, the copyright interests purportedly granted by the document were granted *subject to* those very same rights. The whole of ¶ 9A *expressly preserves* Section 304 termination rights (at least with respect to Elaine, who, at the time, owned one-half), acknowledges that such rights (which had not yet been exercised) *could* be exercised in the future, and accordingly, contains detailed provisions about what would happen if (i) such termination rights were indeed exercised; and (ii) the copyright interests in Steinbeck Works were not subsequently re-granted to Penguin. Neither Thom nor Blake was a party to the 1994 Agreement, and they have never contractually transferred their termination rights to Penguin nor

7

Accordingly, I consider the Penguin termination notice both valid and effective.

### *The Wayward Bus* Termination Notice

In 2004, Thom and Blake, now having between them 100% of the termination rights, sought to terminate author Steinbeck's 1949 grants of *The Wayward Bus* for "all motion picture rights, limited publication rights, radio rights, film, television, and commercial tie-up rights" that had been transferred to Twentieth Century Fox or its predecessors by John Steinbeck pursuant to agreements in 1949. Defendants argue that this termination notice is of no effect because author Steinbeck died before the copyright in this work entered its renewal term, and thus, the renewal copyright automatically went to his next of kin pursuant to Section 304(a).[24]

As observed earlier, in Stewart v. Abend, 495 U.S. 207, 219-20 (1990), the United States Supreme Court recognized that a renewal copyright represents a new estate free and clear of all rights, interests or licenses granted under the original copyright. Id. at 219. Accordingly, the Court stated that "[i]f the author dies before [the renewal right vests], the next of kin obtain the renewal copyright free of any claim founded upon an assignment made by the author in his lifetime. These results follow not because the author's assignment is invalid but because he had only an expectancy to assign [in the renewal copyright]; and his death, prior to the renewal period, terminates his interest in the renewal [term] ..." – which then vests in the statutorily named classes. Id. (internal citations omitted).

The renewal copyright for *The Wayward Bus* came into effect in 1975. Because John Steinbeck died in 1968 – seven years *before* the renewal period would commence for this work – the renewal copyright never vested in the grantee (Twentieth Century Fox) and, therefore, the author's then-living statutory heir, Elaine, inherited those rights free of the previous assignment by the author pursuant to Section 304(a)(1)(C). See Abend, 495 U.S. at 219; Morris, 73 F.Supp.2d at 371-72. Consequently, Twentieth Century Fox had in 2004 no interest in the renewal copyright today, and accordingly, there was nothing there for Thom and Blake to terminate in 2004 and the notice was a nullity.

---

agreed to forego their termination rights. Any interpretation of the 1994 Agreement having the effect of disinheriting the statutory heirs to the termination interest – Thom and Blake – in favor of Elaine's heirs must be set aside as contrary to the very purpose of the termination statute, which protects children and grandchildren, and not just widows. See, e.g., 3-11 NIMMER ON COPYRIGHT § 11.07, n.29.

[24] 17 U.S.C.A. § 304(a)(1)(C), in relevant part, states that "the widow ... or children of the author, if the author is not living ... shall be entitled to a renewal and extension of the copyright in such work for a further term ..."

### The *Cannery Row* Termination Notice

On or about May 17, 2004,[25] Thom and Blake served a notice of termination of the grant for Steinbeck's *Cannery Row* pursuant to Section 304(c) for "all motion picture, radio, and television rights" to Rogers & Hammerstein and MGM in or before 1956 by author Steinbeck. Defendants assert a number of reasons this notice is invalid. I need address only the fact that this identical to *The Wayward Bus* termination, immediately above.[26]

Author Steinbeck registered *Cannery Row* for copyright protection in 1945, and so, the original term of copyright ended in 1973. As John Steinbeck died five years prior to the copyright entering its renewal term, his statutory heir, Elaine, automatically received the renewal copyright. See *Wayward Bus* Termination Notice discussion, *supra*. Thus, neither Rogers & Hammerstein nor MGM possessed any interest in the renewal copyright for Thom and Blake to terminate, so this notice was a nullity.

### *The Long Valley* and *The Red Pony* Termination Notices

In 2004, Thom and Blake, served a notice of termination on Paramount Pictures Corporation, pertaining to a grant of motion picture, radio, and limited publication rights, in Steinbeck's *The Long Valley* and the collection of stories included therein that Paramount's predecessor had received from author Steinbeck pursuant to three agreements in 1946, 1947, and 1949. Simultaneously, Thom and Blake issued a separate but virtually identical termination notice for *The Red Pony* and all stories contained therein, granted to Paramount pursuant to the same contracts.[27] The defendants contest the validity of these two nearly identical notices of termination on the grounds that, under a 1983 Settlement Agreement between Elaine, Thom and Blake's father John IV, Thom and Blake have no existing grants which they can address to terminate.[28]

---

[25] An amended notice was issued on or about June 13, 2004.

[26] Rogers & Hammerstein had transferred the rights it received in or before 1956 to Cannery Row Productions, Inc. by short form option agreement after 1978, and Thom and Blake also served the successor to that transfer with this termination notice. The fact that a copyright grantee made a subsequent post-1978 transfer of rights it acquired pre-1978 does not insulate such from termination. See Morris, *supra*.

[27] John Steinbeck had renewed the copyrights in each of these works during his lifetime, see *supra* n.12, and the grants he made to Paramount appear to meet the termination requirements of the statute.

[28] After a scuffle in court, Steinbeck v. Steinbeck, No. 81 Civ. 6105 (S.D.N.Y. Dec. 8, 1982), Thom, John IV and Elaine entered into a settlement agreement in 1983, pursuant to which Thom, John IV, and Elaine would share equally in the royalties from author Steinbeck's late works – one-third, one-third, one-third – in return for which Elaine was granted exclusive control over the copyrighted works, including the power and authority to execute contracts in their

9

Defendants early asserted that discovery was needed on the agreements which Thom and Blake purport to terminate, and until that time, they wish to reserve their right to contest the validity of these notices, but the troublesome question is why discovery was not timely sought *here.*

So the record remains that, other than this bland conclusory assertion (without sufficient justification)[29] that discovery is needed, defendants are silent on their principal argument that the said 1983 Settlement Agreement invalidated all of the notices of termination which are the subject of the present motion,[30] which I therefore deem to be an abandonment of defendants' counterclaims regarding these two notices. See Jessamy v. City of New Rochelle, 292 F.Supp.2d 498, 515 n. 21 (S.D.N.Y. 2004). Summary judgment on the validity of these notices as a matter of law is granted.

So Ordered.

Dated: New York, New York
June 8, 2006

_____
United States District Judge

---

name. Disturbingly, the settlement agreement also purported to grant Elaine the exclusive right to exercise Thom and John IV's termination rights over the Steinbeck works. Paragraph 5 of the settlement agreement, in particular, is statutorily prohibited, stating: "Elaine Steinbeck and/or her agent shall have the complete power and authority to negotiate, authorize and take action with respect to the exploitation and/or termination of rights in the works of John Steinbeck which John Steinbeck IV and Thom Steinbeck have or will have renewal or termination rights."

[29] At the hearing before me on May 11, 2005, counsel for the defendants stated, for the first time, that the two notices at issue "relate to motion picture rights with respect to a licensee who the, during John Steinbeck's lifetime in a foreclosure action, had those rights transferred ... So it is not at all clear to us, first of all, whether there is anything to terminate, because after a bankruptcy during the course of John Steinbeck's lifetime it's not at all clear whether anything still exists. It would appear that it may be the motion picture rights at issue are actually derivative works, which would essentially take them out of and have different meanings with respect to the termination provisions." Hr'g Tr. 17 (May 11, 2005). The record before me does not support this contention.

[30] If this theory is meant to suggest that the terms of the 1983 Settlement Agreement void all of Thom's and Blake's termination rights – that Elaine successfully contracted away the rights of these statutory heirs when she settled litigation with them – it is barred by the plain language of 17 U.S.C. § 304(c)(5) and (d)(1). Any portion of the settlement agreement which limits or extinguishes Thom's and Blake's statutory termination rights is invalidated as a statutorily-prohibited "agreement to the contrary." See, e.g., Marvel, 310 F.3d at 290-91; Morris, 73 F.Supp.2d at 373-77.

10